COE (KEYSER v.). See Case No. 7,750.

---

## Case No. 2,942.

### COE v. PENNOCK et al.

[6 Am. Law Reg. 27.]

Circuit Court, N. D. Ohio. July Term, 1857.[1]

RAILROAD MORTGAGE — SUBSEQUENTLY ACQUIRED PROPERTY — CONSTRUCTION OF CHARTER — LIEN FOR ROLLING STOCK FURNISHED — ADJUSTMENT OF LIENS.

1. A mortgage given on the entire property of a railroad, including future receipts for transportation, with an agreement that property on the road subsequently acquired, shall be bound, and a conveyance of it be duly executed, gives an equitable lien on property subsequently acquired, to the bondholders of bonds secured by the mortgage.

[See note at end of case.]

2. A charter must be construed according to the intent of the legislature, if such intent can be ascertained, by the language used.

[See note at end of case.]

3. A person who constructs cars, or other rolling stock, for a railroad, if he deliver the stock to the company, without any special provision to receive the payment, can claim no lien on the work. He may effect this lien while the work is in his possession. And if he obtain a judgment against the company for the work, an execution cannot be levied on the rolling stock on which a former lien exists.

[See note at end of case.]

4. Where there are liens on the property of a railroad company, the liens must be adjusted in chancery, where each claimant shall receive his proportionate share of the proceeds. The appointment of a receiver is generally ruinous, and a sale of such property should not be made, under a reasonable prospect of payment, by a faithful application of the profits of the road.

[See note at end of case.]

In equity. Bill by George S. Coe, trustee of the Cleveland, Zanesville and Cincinnati

[1] [Affirmed in Pennock v. Coe, 23 How. (64 U. S.) 117.]

Railroad Company, against Joseph Pennock and Nathan F. Hart and the said company.]

Otis & Weyman, for complainant.

Spalding & Parsons, for respondents.

McLEAN, Circuit Justice. The questions arise in this case on a motion to dissolve an injunction which had been granted, to stay an execution on a judgment at law. The bill states that the Cleveland, Zanesville and Cincinnati Railroad Company, a body corporate and politic, created by the laws of Ohio, and having its principal place of business at Akron, in Ohio, and within the northern district, on the first day of April, 1852, for the purpose of borrowing money to construct a railroad from Hudson, in the county of Summit, to Millersburgh, in the county of Holmes, executed and issued five hundred bonds of one thousand dollars each, payable in ten years from date, with interest thereon at the rate of seven per cent. per annum, payable semi-annually, until the principal shall be paid. That the company sold the bonds for cash, which bonds were duly transferred to the complainant in trust, &c. And the company duly executed a deed to the complainant and to his successors in the trust, and thereby made him assignee of all the present and future to be acquired property of the company in the road to be made, including the right of way, and the land occupied thereby, together with the superstructures and tracks thereon, and all rails and equipments procured or to be procured with the proceeds of said bonds, together with all franchises, rights and privileges of said company; and all property connected with the road was pledged for the payment of the bonds and the interest. And in case of failure to pay the interest or principal, as stipulated, the complainant, or those who should succeed him in the trust, at the discretion or at the request, in writing, of one-half of the bondholders, then unpaid and unconverted into stock, might cause said premises or so much thereof as might be necessary to discharge the principal and interest of all said bonds as might be unpaid, to be sold at public auction, in the city of Cleveland or in New York City, giving at least forty days' notice of the time and place, and the specific property to be sold, etc., and execute a conveyance of the property sold, which should bar the company, &c. No advantage to be taken of stay laws or injunctions, &c. Several locomotives and tenders were purchased, and a great number of passenger and freight cars for the road, also baggage, platform and gravel cars. And the complainant represents that several of these cars have been levied on by the marshal of the northern district of Ohio, by virtue of an execution issued on a judgment obtained by the defendants, Pennock & Hart, against the company. And the company subsequently contracted a large amount of indebtment to

various banking institutions and individuals, for money borrowed, and expended the same upon said road and for other purposes connected therewith; and afterwards, on the 1st of December, 1854, and after all the aforesaid locomotives, tenders, passenger cars, baggage cars, platform cars, gravel and freight cars, had been procured and placed upon said road, the company executed and issued bonds of that date, for various sums, amounting, in the whole, to the sum of seven hundred thousand dollars, payable in fifteen years from the date thereof, and also interest thereon at the rate of seven per cent. per annum, payable semi-annually, and delivered said bonds to its creditors, in some instances as collateral security for, and in other instances in payment of, said indebtment. And the company, by its deed, duly executed, conveyed and transferred to George Mygott and his successors, in the trust thereby created, its said equipments and appurtenances in the same manner, to the same extent, and upon similar trusts to those expressed in the deed to the complainant, &c. The said George Mygott accepted the trust, and caused the deed to be recorded. About twenty-five thousand dollars of these bonds have been used in payment to creditors.

The complainant alleges that the company made default in the payment of the semi-annual instalment of interest due in October, 1854, and has ever since failed to pay the interest in full, which has become due, by which the legal title to the locomotives and other property above specified on the road mortgaged or pledged as above said, became vested in the complainant, to be divested only on the payment of the semi-annual instalments of interest now due on said bonds, and in fulfilment of the deed to make any further assurance to complainant for more fully carrying into effect the object of the first conveyance,—and particularly for the conveyance of any property more perfectly acquired subsequent to the said deed, on the 7th of April, 1855, executed and delivered to complainant a further deed of said road, its equipments and appurtenances, embracing the property specified, which said deed the complainant had duly recorded. And the complainant represents that the whole of said property is an inadequate security for the interest and principal, as they shall become due, on the first bonds of five hundred thousand dollars; and that the company have no other means of payment than by the use of the machinery on the road, in the transportation of passengers and freight. And the complainant further states, that sixteen bonds, dated 1st November, 1854, came into the hands and possession of the defendants, Pennock & Hart, with full knowledge of the aforesaid conveyances made to the complainant and the said George Mygott, but they commenced suit on them, and on the 16th May, 1856, obtained a judgment for $17,765.-

50, with costs, against the said company. And that an execution, having been issued, was levied on the locomotives, tenders, passenger cars, platform cars, gravel cars and freight cars of the road, which have been advertised for sale by the marshal, &c. The Cleveland, Zanesville and Cincinnati Railroad Company, in its answer, admits the facts substantially as alleged by the complainant; and it alleges that the entire line of road proposed to be constructed by it, extended from Hudson, aforesaid, to Zanesville, in the county of Muskingum, at which place it would connect with the Ohio Central Railroad, and also with the Zanesville, Wilmington and Cincinnati road. And with the view of conforming the name of the corporation to these lines of road, application was made to the court of common pleas of Summit county, for a change of the name from that of Akron Branch of the Cleveland and Pittsburg Railroad Company, by which it was incorporated and known, to that of the Cleveland, Zanesville, and Cincinnati Railroad Company; and such proceedings were had, that at the March term of said court, 1853, it was ordered and adjudged that the name of the defendant should be changed as requested; which decree was filed in the secretary of state's office the 17th of March, 1853, and also published in a newspaper in general circulation in the county of Summit. The defendants, Pennock & Hart, admit in their answers, that the deed of 1852 was executed as alleged in the bill, but they deny the validity of that deed, as it was not made in pursuance of the authority conferred on the company by law. They admit the issuing of the five hundred bonds of one thousand dollars each, as charged in the bill, but they allege the bonds were void, not having been made legally. The power to construct a railroad from Hudson to Millersburgh is denied. When the deed of trust was executed, they say, the right of way was not procured by the company, and that the chattels on which the execution was levied had then no existence. They say the interest has not for three years been paid to the bondholders, or to persons for their benefit. They admit the execution of another trust deed in 1854, to secure seven hundred thousand dollars in bonds; and they admit the execution of another deed to the complainant in 1855, but they say that sixteen bonds, of one thousand dollars each, were issued under the mortgage of 1854, which came into the hands of the defendants in due course of trade; but they deny any notice of the mortgage to the complainant. These bonds were accepted by the treasurer of the company, and were payable in New York, in 1853 and 1854; but they were not paid when due, and were protested. They were received as cash in payment for making thirty-five house or freight cars, and forty platform cars. These cars were made and delivered to the company, between the 19th

of May, 1853, and the 15th of February, 1854; and the levy complained of in the bill was made on these cars and others. As the motion was made by the defendants, Pennock & Hart, to dissolve the injunction formerly granted and dismiss the bill, the case must be considered on its final hearing. The merits seem to be fully presented by the pleadings and the deposition of Simon Perkins, the president of the company.

The first ground assumed in the defence is, that "the railroad company, by whatever name it may have been called, had no authority as a corporate body to make a railway from Hudson to Millersburgh; and as a necessary consequence, had no power to borrow money for that purpose. The charter authorizes the construction of a railroad between certain termini, to wit, "from some convenient point on the Cleveland and Pittsburg Railroad, in Hudson, Summit county, through Cuyahoga Falls and Akron to Wooster, or some other point on the Ohio and Pennsylvania Railroad, between Massillon and Wooster." The doctrine stated in the brief, "that corporate powers can never be created by implication nor extended by construction," is admitted. The act under which this company was organized, was unskillfully drawn, and some of its provisions require a careful consideration to ascertain the intent of the legislature. It is entitled "An act to amend an act to incorporate the Cleveland and Pittsburg Railroad Company, passed March 14, 1836." The first section provides, "that the Cleveland and Pittsburg Railroad Company be and they are hereby authorized to construct, under the provisions of their charter, and in the manner hereafter indicated, a branch railroad from some convenient point on the Cleveland and Pittsburg Railroad, in Hudson, Summit county, through Cuyahoga Falls and Akron, to Wooster, or some other point on the Ohio and Pennsylvania Railroad, between Massillon and Wooster, and to connect with said Ohio and Pennsylvania Railroad, and any other railroad running in the direction of Columbus; and for this purpose may increase their capital stock one million of dollars." The second section provides, that for the purpose of constructing and managing said Akron branch road, such persons as may have subscribed for the stock thereof, or for the major part of said stock, may organize by the election of not more than seven directors, who shall elect a president from their number; and, under the name of the "Akron Branch of the Cleveland and Pittsburg Railroad Company," be entitled to all the privileges, and subject to all the restrictions and limitations, granted or imposed by the charter of the Cleveland and Pittsburg Railroad Company, and the amendments thereto; and the Cleveland and Pittsburg Railroad Company may subscribe stock to said Akron branch road, and may aid the said Akron branch organization, by the sale or guaranty of its bonds or otherwise, as they may deem proper.

And power was given to the Akron branch to make an arrangement with the Cleveland and Pittsburg Railroad Company, in regard to the use of their road, and with any other company: provided that the Akron branch and the Cleveland road might merge the same, so as to be under the direction of one company. The first section gives the power to the Cleveland and Pittsburg company to construct the Akron branch under their charter, designating the direction and limit of the branch. No other company or organization is referred to, in regard to the structure and management of the road. But the second section provides for a distinct and an independent organization. The subscribers to the stock of the Akron branch are authorized to organize by electing one of their number president, and under the name of the "Akron Branch of the Cleveland and Pittsburg Railroad Company," be entitled to all the privileges and subject to all the restrictions and liabilities granted or imposed by the charter of the Cleveland and Pittsburg Railroad Company, and the amendments thereto." This adopts the Cleveland charter, and applies to the structure and management of the Akron branch, the same as to the Cleveland and Pittsburg road. The provision in the fourth section of the act which authorizes the Cleveland Company to call a meeting of its stockholders at Ravenna, to act upon the amendments of its charter and for the organization of the Akron branch, in no respect conflicts with the second section. They were required also to call, at the same time, a meeting of the subscribers for the branch stock. Under the act, the subscribers had power to accept the amendment as an extension of the Cleveland charter, as the same interest, or to enter into a separate organization. The latter was adopted, and the road has been constructed under it from Hudson to Millersburgh. This construction of the charter seems to be clear of doubt. The organization was made the 17th of March, 1851, and was continued until the month of March, 1853. At the term of the court of common pleas held in that month, in Summit county, it was ordered, on application of the company, that its name should be changed to that of the "Cleveland, Zanesville and Cincinnati Railroad Company." The requisites of the statute seem to have been complied with, which authorized a change of the corporate name, as was decreed by the court. But it is objected that the company had no authority to construct a road from "Hudson to Williamsburg." The construction of the road was commenced at Hudson, the northern terminus named in the charter, in July, 1851. In 1852 it was extended by the way of the Cuyahoga Falls, to Akron, and it was made to Williamsburg in 1854. The distance from Hudson to Orrville, which is the point where the road intersects the Pittsburg, Fort Wayne and Chicago railroad, is thirty-eight miles; and

from Orrville to Williamsburg, in Holmes county, it is about twenty-three miles, and this is the southern terminus of the road at present. The first section of the act provides that the road shall begin "at some convenient point on the Cleveland and Pittsburg road, in Hudson, Summit county, and run through Cuyahoga Falls and Akron to Wooster, or some other point on the Ohio and Pennsylvania Railroad, now called the Fort Wayne and Chicago Railroad, between Massillon and Wooster, and to connect with said Ohio and Pennsylvania Railroad, and any other railroad running in the direction of Columbus." All the points named in the charter are touched by the road, until it strikes Orrville, which is on the Ohio and Pennsylvania Railroad, and between Wooster and Massillon. Thus far there is an exact compliance with the charter. The Pennsylvania and Ohio road was not named in the charter as its southern terminus. It was to connect with that road and any other railroad running in the direction of Columbus. This language cannot be construed. Millersburgh it appears is twenty-three miles south of Orrville, in the direction to Zanesville, to which place it is the intention of the company to extend their road. At that point it will connect with the Central Ohio road, which leads to Columbus. I think the company was authorized by the charter to extend their road to Zanesville. No one can suppose that the connection with the Pennsylvania and Ohio road by the way of Crestline to Columbus, was intended as the terminus of the road, as the distance, if not double, would be much greater on that line than on a direct route. The same objection applies, in a less degree, perhaps, to the Steubenville and Newark road. The connection at Zanesville, on the Central road, was the most direct route to Columbus, and it is within a reasonable construction of the charter. I think, therefore, that Millersburgh, being in the direction from Orrville to Zanesville, the road was properly constructed to that point, with the view of its being extended to Zanesville. The first section of the act authorized the Cleveland Company, in view of the Akron branch, to increase its capital a million dollars; and under the second section of the act, this provision is applied to an independent organization, and gives to it all the privileges of the Cleveland and Pittsburg Company under its original charter, subject to all the restrictions and liabilities which it imposes. Here are corporate powers conferred to the extent of the charter referred to. From an act to revise and amend "An act to incorporate the Cleveland and Pittsburg Railroad Company," dated March 14th, 1836 (section 6), power was given to said company, by its proper officer duly authorized by the directors, to "mortgage, hypothecate or pledge, all or any part of said railroad, or of any other real or personal property belonging to said company,

or of any portion of the tolls and revenues of said company, which may thereafter accrue, for the purpose of raising money to construct said road, or to pay debts incurred in the construction thereof." And in the act regulating railroad companies, passed February, 11, 1848, in the sixth section, it is provided, "Such company shall have power to borrow money on the credit of the corporation, not exceeding its authorized capital stock, at a rate of interest not exceeding seven per cent. per annum, and may execute bonds or promissory notes therefor, and to secure the payment thereof, may pledge the property and income of such company." To the same purport is the act of 1852. Swan, Dig. 199–203.

In the defence it is assumed, that the mortgage or trust deed made by the railroad company to the complainant is void, for the reason that it pledges property "thereafter to be acquired," at least so far as regards such after acquired property, and a number of authorities are cited to sustain this position. In 4 Comyn, Dig. "Grant," D, p. 310, it is said, "A man cannot grant a thing which he has not." Moody v. Wright, 13 Metc. [Mass.] 32, Chapman v. Weiner, 4 Ohio, 481, 2 Story, Eq. Jur. § 1021, and other authorities are cited as sustaining this doctrine. It is admitted that at common law, a man cannot grant or convey an effective title to land or anything else to which he has no right; but if this be done by general warranty, and he afterwards acquires a title to the land granted, the first deed operates as a good title by way of estoppel. The term "grant," in its largest sense, comprehends everything that is granted, or may be passed from one to another. It includes incorporeal as well as corporeal rights; but a feoffment was void without livery of seisin. In his treatise on Equity Jurisprudence, Mr. Justice Story says, in regard to property that may be mortgaged (volume 2, § 1021): "In equity, whatever property, personal or real, is capable of an absolute sale, may be the subject of a mortgage." Rights in remainder and reversion, possibilities coupled with an interest, rents, franchises, and choses in action may be mortgaged, but a naked possibility or expectancy, such as that of an heir, cannot be. By the civil law a party may mortgage property to which he has no present title, by contract or otherwise. But it is not necessary to consider, at large, whether the mortgage in question, in regard to the equipments of the road acquired subsequent to the date of the mortgage, is operative at common law; as, if it cannot be so considered, there can be no doubt it is good in equity, and the question comes before us on a bill in equity. It seems to be admitted, as it is not denied, that the future profits of the road are subject to the mortgage. And what difference in principle can there be in the future profits, and the necessary expenditure to produce such profits? Repairs, when necessary, of

the rolling stock on the road, are not more within the mortgage than the purchase of the necessary supplies of such stock, as the public accommodation shall require. The mortgage was on a railroad in full operation, embracing every necessary equipment and accommodation to give to it the utmost efficiency. This entered into consideration of the parties to the mortgage, and anything short of this, would, in a great degree, impair the security of that instrument. Suppose a sheriff or constable had levied upon one or more of the passenger cars or of the locomotives, within a few days after the machinery on the road was in motion; can any one suppose that the mortgage could have been defeated or its security impaired by such a step. Will it not be said that in such a case the stock would be within the protection of the mortgage? This no one could doubt, as a withdrawal of the stock from the road would not only impair the obligations of the mortgage, but defeat its object. In this respect, a railroad in operation must be considered as protected in the capacity in which it was mortgaged; and this is so manifest that the public, and especially subsequent creditors, are bound to know it. But the protection by the mortgage of the equipments upon the road, in the case supposed, is not more indispensable than to keep them in repair, replace them when destroyed, or add to them when required by the public exigencies; these are all within the purview of the mortgage, the contemplation of the parties, and known to the public. Does this view impose any hardship on the manufacturer of a part of the equipments, subsequent to the date of the mortgage? Certainly it does not. He has a right to retain the possession of his work until it is paid for or the payment secured. Having delivered possession to the company in the ordinary course of business, without receiving the payment, he can assert no lien upon it either in law or equity; he stands in relation to the company on a footing with other creditors who have no security for their debts. In Mitchell v. Winslow [Case No. 9,673], Mr. Justice Story says, "Courts of equity give effect to assignments, not only of choses in action, but of contingent interests, expectancies, and also of things which have no actual or potential existence, but rest in mere possibility only. In respect to the latter, it is true, the assignment can have no positive operation to transfer, in praesenti, property in things not in esse; but it operates by way of present contract, to take effect and attach to the things assigned, when and as soon as they come in esse; and it may be enforced as such a contract in rem, in equity." The same doctrine is laid down by Lord Hardwicke. Also, it was held in Hobson v. Trevor, 2 P. Wms. 191; Carleton v. Leighton, 3 Mer. 667; 5 Maule & S. 228; Curtis v. Auber, 1 Jac. & W. 526, 532; 1 Mylne & K. 488; Langton v. Horton, 1 Hare, 549; Mitford v. Mitford, 9 Ves. 100. In his

Equity Jurisprudence (section 1231), Mr. Justice Story says, "In equity there is a lien, not only on real estate, but on personal property, or on money in the hands of a third person, wherever that is a matter of agreement, at least against the party himself, and third persons who are volunteers and have notice. For it is a general principle in equity, that as against the party himself, and any claiming under him voluntarily or with notice, such an agreement raises a trust." The mortgage having been placed upon record in the three counties through which the road was to be constructed, and was in fact constructed, I suppose it must operate as a notice of its contents. See Hawthorn v. New Castle & N. S. Ry. Co., reported in Criss on Liens, Append. 408; Abbot v. Goodwin, 20 Me. 408; 2 Appl. & Shep. [20 Me.] 408; Macomber v. Parker, 14 Pick. 497.

The third ground assumed is, "that the trust deed is void for uncertainty as to the nature and extent of the grant." The instrument has been attentively read and considered, and no uncertainty is perceived in its conditions, or as to the objects on which it is to operate. If its language were so vague as not to specify these matters with at least reasonable certainty, the mortgage could not be specifically enforced. But as this objection does not seem to arise on the face of the instrument, and has not been shown in the brief of counsel, no further examination will be given to it.

In the fourth ground, it is contended that the mortgage is void under the statute of frauds. As the trust deed was entered into under the enactments of the legislature, it certainly cannot be said to be against the policy of the law; and it is not perceived that any of its provisions conflict with the statute of frauds, seeing that they are authorized by a law subsequent to that statute.

In the fifth and last ground, it is contended, "the plaintiff does not show himself entitled to call upon this court to stay the hand of the judgment creditors." The first mortgage to the complainant, Coe, was dated the 1st of April, 1852; the second to the same individual bears date in March, 1855. Prior to the execution of the second deed of trust to the complainant, a mortgage, similar to the one first executed to the complainant, was given to George Mygott, by the same company, and on the same road, its equipments, &c., dated 1st of November, 1854, to secure the payment of bonds to the amount of seven hundred thousand dollars, which it was proposed to issue for the completion of the road, &c. It appears that the company employed P. F. Geisse to build, for its use on the road, a number of cars, of different descriptions; and that in payment of the balance of his account, on the 20th of November, 1854, he received sixteen of the second mortgage bonds secured by the trust deed given to George Mygott. The judgment complained of was obtained on these

bonds by Pennock & Hart. As the first mortgage of the complainant was executed the 1st of April, 1852, it is contended by the defendants' counsel, that the first mortgage cannot avail him, as to the two locomotives, the Hercules and Vulcan, and the passenger cars 3, 4, 5 and 6, none of which were in existence until the fall of 1853, and the spring of 1854, and that before the execution of the complainant's second mortgage, in March, 1855, this property had been conveyed to George Mygott, by the trust deed dated November 1st, 1854, to secure sundry bonds, of which the sixteen on which the judgment was entered, formed a part. This argument rests upon the hypothesis, that as the two locomotives and passenger cars referred to were received by the company after the date of the first mortgage, and before the second mortgage was given to Mygott, and as the bonds on which the judgment was obtained were secured by the second mortgage, the complainant can claim no lien on this property under his first mortgage. The passenger cars and the locomotives referred to were in possession of the company, and employed upon the road, some months before the mortgage was executed to Mygott. It appears that Geisse, before he received the sixteen bonds, had taken from the company a draft for the amount due, on New York or some other place, which was returned protested for non-payment. On the return of the draft, the bonds were paid to him as the only means of payment, within the power of the company. From this statement it is clear, that the defendants Pennock & Hart, as creditors of the company, stand upon no other ground and have no higher claim than any other holders of bonds issued under the second mortgage. Geisse, the builder of the cars, having delivered them to the company, without taking a special lien, if he continued to be the holder of the bonds, would have no better claim than the defendants, who are his assignees. The bonds, it is presumed, are payable to bearer, and pass by delivery. Pennock & Hart are purchasers in the market, the same as other holders of bonds, covered by the second mortgage. A part of the gravel cars levied on by the sheriff were sold, with the consent of the counsel in this case, and also of the complainant and the first bondholders; but the levy is understood still to include cars, &c., which belonged to the company when the first mortgage was given. In the first mortgage, for the consideration stated, the company covenanted to "execute and deliver any further reasonable and necessary conveyance of the premises, or any part thereof, to the party of the second part, his successors in said trust, and assigns, for more fully carrying into effect the objects hereof, particularly for the conveyance of any property acquired by said parties of the first part, subsequently to the date hereof, and comprehended in the description contained in the premises."[*] It is presumed the third mortgage deed to the complainant was executed in 1855, under this covenant. Entertaining the opinion that the first mortgage, by virtue of the above and other covenants which it contains, operated as an equitable mortgage on subsequently acquired equipments for the road, which was not displaced by the second mortgage, it is not deemed necessary to inquire what, if any, legal effect can be given to the last mortgage. Holly v. Brown, 14 Conn. 255.

It is alleged in the bill, that the entire property of the road will be inadequate to the payment of the first mortgage. The wisdom of the first bondholders was manifestly shown, by permitting the road to remain under its present management, being satisfied that the directors had discharged their duties faithfully and economically. This seems to be the only course that can retrieve the affairs of the company. In most cases, to place such a concern in the hands of a receiver, involves it in hopeless ruin.

Had Pennock & Hart, as holders of the sixteen bonds, a right to bring suit on them at law, and having obtained a judgment, to sell on execution a part of the mortgage property without reference to the claims of other creditors under the same or other mortgages? Against such a procedure there are three insuperable objections: 1. A sale on execution would convey to the purchaser no exclusive right to the property sold. 2. Such a sale would not divest the equitable rights of other bondholders. The purchasers could receive only the same and no greater right than that which was vested in them by the bonds. 3. The claim must be prosecuted in equity, where all who have an interest in the subject matter may be made parties. In equity, only, can the rights of all the parties be properly adjusted. And this is especially the case where the property mortgaged is inadequate to the payment of all the creditors. In addition to these considerations, from the nature of the property levied on, it could not be separated from the road, without suspending, in whole or in part, its operations. And what could be more unjust than this, to the other bondholders? The operation of the machinery on the road, in the transportation of passengers and freight, constitutes its chief value. The railroad, like a complicated machine, consists of a great number of parts, a combined action of which is essential to produce revenue. And as well might a creditor claim the right to levy on and abstract some essential part from Woodworth's planing machine, or any other combination of machinery, as to take from a railroad its locomotives or its passenger cars. Such an abstraction would cause the operations to cease in both cases. As before remarked the proper mode of enforcing payment against a railroad company,

on bonds secured by mortgage, is, to bring the creditors and the railroad company into chancery, where the earnings of the road, through a faithful agency, may be distributed equitably among the creditors. And in a case where such a course would not satisfy the reasonable demands of creditors, to sell the road and distribute among them its proceeds. Such an extreme procedure, however, should not be authorized by any court, except under circumstances of absolute necessity. 13 Serg. & R. 210; 9 Ga. 377; 9 Watts & S. 27. A stronger ground for an injunction than is taken in this case, could not well be conceived. The defendants, under a judgment at law, have levied upon a large part of the rolling stock on the road, which, if sold and removed, will stop its operations, while the same stock is under mortgage to creditors whose lien is prior to that of the defendants. Such a procedure, if carried out, in this and other cases, would defeat the liens of creditors, in such cases, to many millions of dollars, and put an end to the structure, if not the maintenance, of railroads. The court will perpetually enjoin the proceedings in the case at law, as prayed by the bill, at the costs of the defendants, Pennock & Hart.

[NOTE. The defendants Pennock & Hart appealed to the supreme court, where the decree of the circuit court was affirmed.

[The court (Mr. Justice Nelson delivering the opinion) substantially held that complainant's mortgage attached to the future acquisitions, as therein described, from the time they came into existence; that, the mortgage being a valid and effective security for the bondholders of prior date, they had the superior equity to have the property in question applied to the discharge of the bonds; that the individual bondholders under the second mortgage were properly restrained from proceeding at law to collect their debt, as such a course would not only give them a preference over their associates, but would also have the effect to prejudice the superior equity of the first mortgage bondholders; and that the extension of the road to the Ohio Central road at Zanesville was fairly within the terms of the charter requiring the connection with the Ohio & Pennsylvania Railroad, "and any other railroad running in the direction of Columbus." Pennock v. Coe, 23 How. (64 U. S.) 117.]