Morrill *v.* Noyes.

---

LEVI MORRILL & *als. versus* JOSEPH C. NOYES.[*]

The Y. & C. Railroad Company, in 1851, issued bonds for the purpose of completing and equipping their railroad, and secured them by a mortgage, in trust, of their railroad and franchise, together with all " cars, engines and furniture, that have been or may be purchased by said company." In 1853, the company purchased an engine and certain cars, which they subsequently mortgaged to the plaintiffs. In 1859, a bill in equity was commenced by the holders of the bonds against the company and the assignees of the former mortgage, to compel the execution of the trust, and the defendant was appointed a receiver by consent, who took all.the property of the railroad from the possession of the company, to hold the same under the. direction of the Court *pendente lite.* The plaintiffs thereupon demanded the engine and cars of the receiver, and, upon his refusal to deliver the

[*] This case did not come into the possession of the present Reporter until Nov. 6, 1869.

property, they commenced an action of trover, and obtained leave of Court to prosecute it: — *Held,*

1. That there had been no conversion by the defendant;

2. That, if the property belonged to the plaintiffs, they should have tried the title by a suit for the possession, but could not maintain trover.

3. That under the former mortgage a lien was created upon the rolling stock to be subsequently acquired, which attached as soon as it was afterwards purchased and placed upon the railroad by the company; and,

4. That the plaintiffs acquired no title under their mortgage which they could maintain against those holding under the former mortgage.

## ON REPORT.

TROVER to recover the value of one locomotive, one passenger car, four platform cars, one box and two donkey cars. The writ was dated Sept. 25, 1860. Plea, general issue and joinder.

To sustain their title, the plaintiffs put in a mortgage of the property in controversy, dated Dec. 3, 1853, duly executed and recorded, from the York & Cumberland Railroad Company to the plaintiffs.

In behalf of the plaintiffs, it appeared that the property was purchased and put upon their road by the company in different months in 1853; that, on Oct. 26 and 31, 1859, the plaintiffs took nominal possession of the property for breach of the condition of their mortgage, but did not remove it, but notified the defendant that they had taken possession and left it in the possession of the defendant, who continued to use it as before; that, on Sept. 24, 1860, the plaintiffs demanded the property of the defendant, who refused to surrender it, and the plaintiffs obtained, on their petition in the suit of *Mason, in Eq., versus Y. & C. R. R. Co.*, an order from this Court granting them leave to prosecute this suit.

On the part of the defendant, it appeared that, on Feb. 6, 1851, one Myers entered into a contract with the Y. & C. R. R. Company to build and equip their railroad for certain considerations therein expressed, and was to receive, among other things, a certain amount of the bonds of the company; that, on the same day, the Y. & C. R. R. Company, in consideration of the contract made with them by

Myers, conveyed to "said Myers and his assigns, who shall become the holders of the bonds and coupons hereinafter mentioned, each in the ratio of the bonds so held by him, the franchise of said corporation with all its privileges and immunities, as the same exists by virtue of said Act of incorporation and the laws of the State, together with all personal and real property * * however situated, and as the same has been or may be purchased, * * meaning to include herein all iron rails, road bed, track and other structures, of said corporation, now completed or in the process of being furnished and constructed, or that may be acquired, and as the same shall be when finished, be the same more or less, and throughout the whole line of said road, and including all cars, engines and furniture, that have been or may be purchased by said company. To have and to hold the aforegranted and bargained premises, with all the privileges and appurtenances thereof to the said Myers, his heirs and assigns, and to the holders of said bonds and coupons, to their use and behoof forever.

"*Provided*, nevertheless, that if the said corporation, or their agents or assigns, pay to the said Myers, or his assigns, who shall become the holder or holders thereof, the amounts specified in the several bonds and coupons that shall be issued concurrently with these presents, and such also as shall hereafter be issued by the directors of said corporation, according to and to satisfy the terms of the contract existing between said corporation and said Myers, dated Feb. 6, 1851, for the construction and equipment of said railroad * * then this deed shall be null and void thereafter," &c.

It also appeared that *Mason & als.*, bond-holders, in 1859, filed a bill in equity against the *Y. & C. R. R. Company*, and others to whom the Myer's mortgage had been assigned, to compel them to execute the trust thereby created; that, at the Jan. term, 1860, the defendant in this action was appointed receiver to take possession of, hold, and manage the entire property of the railroad company during the

pendency of the bill; that the engine and cars in controversy were found by the defendant in the possession of the company, in daily use upon the road; and that he took possession of them with the other property of the company, in March, 1860, by virtue of his commission as receiver, and claimed to hold them under that authority alone.

The full Court were to order a nonsuit or default according to the legal rights of the parties.

*E. & F. Fox,* for the plaintiffs.

*Rand,* for the defendant.

DAVIS, J. — This is an action of trover against the receiver of the York & Cumberland Railroad, to recover the value of a locomotive and several cars. The property in controversy was purchased in 1853, at different times, and mortgaged to the plaintiffs in December of that year.

Feb. 6, 1851, the Railroad Company mortgaged to John G. Myers, their railroad, then in process of construction, with all their real and personal property, franchises, &c., "including all cars, engines, and furniture, that have been, *or may be* purchased for or by said company." This mortgage to Myers was *in trust,* to secure the payment of bonds to be issued for the purpose of finishing the construction and equipment of the railroad; and it was afterwards assigned by Myers, and came into the hands of Churchill and others, who now hold it, in trust, to secure the bonds issued in accordance with its provisions. The papers in the equity suit, with which this is connected, show that the mortgage was duly recorded in the registry of deeds for the county, and also in the city registry of mortgages of personal property. The copy in this case has no certificate of registry by the city clerk, but no question is raised by counsel on this point.

In 1859, certain holders of the bonds commenced a suit in equity against the company and Churchill and others who now hold the mortgage, to compel them to execute the trust created thereby; and Noyes, the defendant, by consent of

the parties, was appointed a receiver, to take possession of, hold, and manage the entire property, while the bill should be pending. The engine and cars in controversy were found by him in possession of the company, in daily use upon the railroad; and he took possession of them, with the other property, in March, 1860.

After he had been in possession of the railroad about six months, the plaintiffs demanded the engine and cars mortgaged to them in 1853, and he refused to deliver them. They thereupon commenced this suit, charging him with a conversion of the property on the day of the demand, and claiming to recover the value of it of him personally.

There is no evidence that they had ever taken the property into their actual possession. By their agent, they nominally took possession of it, while it was in use on the railroad track, in October, 1859. But they did not remove it, or attempt to interfere with the possession of the company. They left it as it was before; and they must have known that the company continued to hold and use it. They must be presumed to have consented to such possession and use. If the company had been strangers, it might have been otherwise. But so long as the mortagees of such personal property leave it in the possession of the mortgagers, without forbidding them to use it, they certainly cannot be trespassers for so doing.

The counsel for the plaintiffs is undoubtedly correct in saying that, if a receiver should take possession of property not embraced in the order by which he is appointed, or in the commission under which he acts, he would be personally liable to the owner. If he exceeds the authority conferred upon him, he can show no justification as an officer of the Court.

But, in the case at bar, the property in controversy was embraced in the receiver's commission. It was in the possession of the railroad company, and constituted a part of their rolling stock. It was mortgaged to the plaintiffs; the right of redemption, unless the forfeiture had been waived,

was lost. But the possession of the company was not wrongful. The receiver succeeded to the rights of the company. As *they* were not trespassers, *he* was not.

Nor do the plaintiffs claim that the defendant came wrongfully into the possession of the property, in March, 1860. They ground their suit upon a subsequent demand made by them, and a refusal by him to deliver it. They allege in their writ a conversion by such refusal, Sept. 24, 1860.

A receiver is not merely an agent of the complainants, in the suit under which he is appointed. He represents the Court, for all the parties interested in the property, and acts, instead of the Court, for the benefit of all. He is the servant of the Court. His possession is the possession of the Court; and any attempt to interfere with it, without leave of Court, is a contempt. 2 Story's Eq., 829; *Green* v. *Bostwick*, 1 Sandf. Ch., 185; *Angell* v. *Smith*, 9 Vesey, 335.

It is the duty of the receiver to take possession of the property. If the person who has possession refuses to deliver it up, if he is a party to the bill, he may be proceeded against for a contempt. If he is not a party, he may be made one for that purpose. Or the receiver, by leave of Court, may proceed to recover possession by a suit at law. *Parker* v. *Browning*, 8 Paige, 388; *Wynne* v. *Newborough*, 3 Bro. Ch., 88; *Green* v. *Winter*, 1 Johns. Ch., 60.

After the receiver has taken possession, any person claiming the property, or any interest therein, may present his claim to the Court. He may be made a party to the suit in order to establish his claim. Or he may petition to have it heard before a master. Or he may, by express permission of the Court, bring a suit for the possession, care being taken to protect the receiver. But the receiver will not be ordered to deliver the property to a claimant until his right is established, in one of these modes. Nor can any claimant bring a suit against the receiver, except by leave of Court, without being liable for a contempt, if the property is a part of the subject matter in controversy. 2 Story's Eq.,

833; 3 Daniel's Ch., 1982; 6 Ves., 287; *Noe* v. *Gibson,* 7 Paige, 513; *Albany Bank* v. *Schermerhorn,* 9 Paige, 372; *Howell* v. *Ripley,* 10 Paige, 43.

These general principles are decisive of the case before us. The receiver came rightfully into possession of the property. It was his duty to retain possession until ordered otherwise by the Court. The plaintiffs had leave to bring this suit, but they chose the form of their action. They have mistaken their remedy. Their action is not a suit for the possession, but is an attempt to hold the receiver personally liable for the value of the property. Such an action cannot be maintained under the circumstances of this case. Whether in any case an action of trespass or trover can be maintained against a receiver, when he rightfully takes possession of the property, is a question upon which it is unnecessary for us to express any opinion. If the property is real estate, so that the title can be tried in an action of trespass, without changing such title, or rendering the receiver liable for the value, perhaps there would be no objection to its maintenance. Or, if he has received the rents of real estate, or has sold personal property, by order of the Court, perhaps the amount in his hands may be claimed in a suit at law. But in the case at bar, the plaintiffs, if the owners, can only recover the possession, in an appropriate action therefor.

But if, for this reason, the plaintiffs cannot recover in this suit, still it may be well for us to examine their title to the property, in order to save further litigation. The question has been fully presented and argued. The plaintiffs claim that the engine and cars sued for could not have been conveyed by the mortgage to Myers, of Feb. 6, 1851, because not in existence at the time. They were not purchased by the railroad company until 1853. As the mortgage to the plaintiffs was made after the purchase, their title is good unless the title passed to Myers, in trust, by the first mortgage.

The question whether a mortgage of personal property

not in existence, or not owned at the time by the mortga-
ger, can be made available by the mortgagee, as a lien upon
property afterwards acquired, has been discussed in many
recent cases, with some apparent difference of opinion.

Some of the courts have denied that any difference exists,
and have attempted to reconcile the cases on the ground
that such a mortgage, though void at law, is valid in equity.
But this is a loose use of language, that tends more to con-
fuse than to reconcile. If such a mortgage is absolutely
void, for want of any subject matter to support it, then it
should be so held in equity, as well as at law. But, if not
thus void, to what extent, and in what sense, is it valid? It
is only by conceding its validity, that it is pertinent to in-
quire whether the remedy is in equity, or by a suit at law.

In other cases the reasoning is syllogistic and summary.
" *Qui non habet, ille non dat.*" A mortgage is a grant.
Therefore a mortgage of what one does not own, or of what
is not *in esse*, is void.

But a mortgage is a grant, to be defeated upon a condi-
tion. This makes it merely the creation of a lien, with cer-
tain rights to secure and enforce it. A lien may be created
without a grant. And sometimes a contract intended as a
grant, but ineffectual as such, will be upheld in equity as a
lien. So that the syllogism is by no means certain to dis-
pose of the question.

As a general proposition it may be said, that a mortgage
of such goods as may be in a store on a future day, — or of
such furniture as may be in a house, — or of such machin-
ery as may be in a mill, — or of such stock as may be on a
farm, — when no particular property is referred to, will not
convey any title to, or create any lien upon, such property
subsequently acquired, which can be upheld or enforced in
a suit at law. *Head* v. *Goodwin*, 37 Maine, 181; *Barnard*
v. *Eaton*, 2 Cush., 294; *Codman* v. *Freeman*, 3 Cush.,
306; *Otis* v. *Sill*, 8 Barb., 102; *Gardner* v. *McEwen*, 19
N. Y., (5 Smith,) 123; *Tapfield* v. *Hillman*, 46 Eng. C.

L., 243 ; *Lunn* v. *Thornton*, 50 Eng. C. L., 379 ; *Gale* v. *Burnell*, 53 Eng. C. L., 850. In Connecticut, a mortgage of a shifting stock of goods in a store, was held to create the same lien upon goods subsequently purchased as upon those owned at the time. *Holly* v. *Brown*, 14 Conn., 255. A similar decision was made in this State, in the case of *Head* v. *Goodwin*, 37 Maine, 181. But that case was questioned in *Jones* v. *Richardson*, 10 Met., 481 ; and it was substantially overruled in *Pratt* v. *Chase*, 40 Maine, 269. The question is therefore no longer an open one in this Court.

It should be noticed, however, that in nearly all the cases cited, the mortgages were exceedingly indefinite. Some of them described no particular property which could be identified ; but they were mortgages of mere contingencies of such property as the mortgagers might purchase, if they should purchase any. They were void for uncertainty, if for no other reason. *Winslow* v. *Merchants' Ins. Co.*, 4 Met., 306. Except the case of *Otis* v. *Sill*, 8 Barb., 102, they probably would not have been upheld in equity, any more than at law. *Mogg* v. *Baker*, 3 Mees. & Welsb., 195 ; *Moody* v. *Wright*, 13 Met., 17.

We can understand these cases better by referring to another class in which conveyances of property, not in existence at the time, have been upheld, either at law or in equity. And we think it will be seen that sales or mortgages of such property have been sustained when within the following rules.

1. The contract must relate to some particular property described therein, which, though not in existence, must be reasonably certain to come into existence, so that the minds of the parties may be in agreement as to what it is to be, and, if the sale is absolute, what, with reasonable certainty, taking the ordinary contingencies into consideration, is the present value?

2. The vendor or mortgager must have a present, actual interest in it, or concerning it. As is said in illustrating

Rule 14, of Bacon's Maxims, " the law doth not allow of grants, except there be the foundation of an interest in the grantor." There must be something *in presenti*, of which the thing *in futuro* is to be the product, or with which it is to be connected, as necessary for its use, or as incident to it, constituting a tangible, existing basis for the contract.

The application of these principles to the multifarious affairs of a business people, may sometimes be difficult. And in the various enterprises that are likely to be undertaken in a country distinguished for its manufactures, and its domestic and foreign commerce, new applications of them from time to time may be required. But the illustrations to be found in the decided cases will be sufficient for our present purpose.

Thus, one may sell all the wool which shall grow for a term of years on sheep owned by him at the time ; but not the wool to be grown on so many sheep, if he does not own them. *Grantham* v. *Hawley*, Hobart, 132 ; *Smith* v. *Atkins*, 18 Verm., 461. So he may sell the grass, or any crop that does not require annual renewal, that shall grow upon his farm for a term of years. *Jencks* v. *Smith*, 1 Coms., 90 ; *Bank of Lansingburg* v. *Crary*, 1 Barb., 542 ; *Milliman* v. *Neher*, 20 Barb., 37.

If one contracts for the construction of a carriage, or a vessel, for himself, and pays therefor, he acquires no title until it is completed and delivered. *Mucklow* v. *Mangles*, 2 Taunt., 318 ; *Comfort* v. *Kiersted*, 20 Barb., 472. But if he *buys* a chattel in process of construction, and it is delivered to him, though afterwards to be finished, the title passes, and the additions made to it for the purpose of completing it become his property from the time when they are attached to it. The only reason why the conveyance of a vessel on the stocks was not upheld as a mortgage, in *Bonsey* v. *Amee*, 8 Pick., 236, was because there was no delivery, and the registry law had not then been enacted, which renders a delivery unnecessary. *Call* v. *Gray*, 37 N. H., 428. A mortgage of unfinished chattels gives the

mortgagee a good title to them when finished. *Harding* v. *Coburn*, 12 Met., 33; *Jencks* v. *Goffe*, 1 R. I., 511; *Perry* v. *Pettingill*, 33 N. H., 433.

So the owner of a ship may assign the freight of a voyage which has been commenced. *In re ship Ware*, 8 Price, 269; *Douglas* v. *Russel*, 1 M. & K., (7 Eng. Ch.,) 488. Or he may sell the oil and cargo to be brought home from a whaling voyage then being prosecuted. *Mangton* v. *Horton*, 1 Hare, 549; *Fletcher* v. *Morey*, 2 Story, 555. And a laborer, employed by another, may assign his wages afterwards to be earned; but not unless they are to be earned under an existing contract. *Mulhall* v. *Quinn*, 1 Gray, 105; *Twiss* v. *Cheever*, 2 Allen, 40; *Lannan* v. *Smith*, 7 Gray, 150.

In the case at bar, the subject matter of the contract was sufficiently definite and certain; its subsequent existence was reasonably sure; and the mortgagers had an existing interest in, and title to, the other property then mortgaged of which this was to be an essential part, necessary for its use, to be added to it for the purpose of finishing it. It is entirely unlike the case of a changing stock of goods.

The mortgagers had a charter for a railroad, with all the necessary franchises and rights for its construction, equipment, and operation. The mortgagee had previously contracted to construct and equip it for the company; and the work had been commenced. He was to be paid partly in the bonds of the company, which would sell in the market. Thereupon they mortgaged to him, and in trust for the holders of the bonds, their franchise, road, rights of way, materials, buildings, completed, or in process of construction, " including all cars, engines and furniture, that have been or may be purchased for or by said company," to secure the contract " for the construction and equipment of said railroad," and to secure the payment of the bonds to be issued to the mortgagee, to him, " or to his assigns, who shall become the holders of said bonds."

A large part of the numerous railroads in this country

have been constructed by the aid of mortgages, to individuals, or to trustees. Many of these mortgages, perhaps most of them, embrace, specifically, engines and cars, to be subsequently acquired. As they are made to secure bonds not to be due for many years, and the rolling stock is perishable, unless such future acquisitions can be mortgaged, as incident to, and essential to the use of, the railroad itself, the security is liable to be greatly diminished. The question is one of great importance in respect to the interests involved in its determination. Nor is it a new one. It has been considered by several courts of the highest respectability; and such mortgages have been sustained, not only as to existing property, but as to that subsequently acquired. *Pierce* v. *Emery*, 33 N. H., 484; *Seymour* v. *C. & N. F. Railroad Co.*, 25 Barb., 286; *Trust Co.* v. *Hendrickson*, 25 Barb., 484; *Coe* v. *Hart & al.*, 6 Am. Law Reg., 27; *Pennock* v. *Coe*, 23 Howard, 117; *Phillips* v. *Winslow*, 18 B. Monroe, 531.

In nearly all these cases the question is discussed with much research and force of reasoning. And, in the absence of contrary decisions, they constitute a weight of authority not to be disregarded, unless it can be clearly shown that they are erroneous.

In some of them, the companies were specially empowered by legislative acts to mortgage their property and franchises. In the case of *Howe* v. *Freeman*, 14 Gray, 566, such a mortgage was upheld on the subsequent confirming statute, with an intimation that otherwise it would have failed. But the general question was not considered by the Court. The power of a corporation, without any legislative act, to mortgage its franchises with other property, to secure its liabilities, has never been questioned in this State, though such mortgages have been common for many years, and rights under them have been determined in this Court. The weight of authority in this country is in favor of the doctrine that the power to mortgage is incident to the rights granted by the Act of incorporation. Even if the franchise

to be a corporation cannot be assigned, " the franchises to build, own and manage a railroad, and take tolls thereon, are not necessarily corporate rights ; they are capable of existing in and of being enjoyed by natural persons, and there is nothing in their nature inconsistent with their being assignable." CURTIS, J., in *Hall* v. *Sullivan Railway*. At most, it would seem that an assignment can only work a forfeiture. And if the State waives such forfeiture, the question cannot be raised collaterally by other parties. The cases on this subject are cited and reviewed in Redfield on Railways, § 235, notes 19 and 20. The mortgage, in the case at bar, of all the franchises and property of the corporation, is as effectual between the parties to it, as if, like those in some of the cases cited, it had been made under a special Act of the Legislature. Whether the assignees of the mortgage, without any further proceedings, legislative or judicial, will have all the corporate rights of the company, is not a question now presented. The subsequent statute of 1852, prohibiting any company from assigning any rights under its charter without the consent of the Legislature, expressly excepts mortgages made to secure debts of the corporation, and recognizes their validity. R. S., c. 51, § 31.

In the case of *Trust Company* v. *Hendrickson* it was held that, as between mortgagers and mortgagees, the engines and cars were fixtures, so that, without any express grant, they would have become the property of the mortgagees by being attached to the railroad. If they were fixtures, that result would follow, although they were not in existence when the mortgage was given. That they have some of the qualities of fixtures cannot be denied. They are fitted to the gauge of the road, and are adapted to the particular use upon it. In the modern cases, whether an article is a fixture is determined more by such considerations, than by its being actually attached to the land. Without the rolling stock, the road is not only worthless to the company, but it

ceases to be of any public use. Important public interests are therefore involved in the question.

But, if the engines and cars are not fixtures, they are so connected with the railroad, and so indispensable to its operation, that there is a clear distinction between them and other kinds of personal property. They may well be held to be exceptions to the general rule that pro perty not *in esse* cannot be conveyed. We do not mean to intimate that rolling stock to be subsequently acquired could be mortgaged without the railroad. But when the railroad itself is mortgaged, with the franchise, the rolling stock to be acquired for the purpose of completing or repairing it is so appurtenant to it, that the company have a present, existing interest in it, sufficient to uphold the grant of both together, — the one as incident to the other. Their title to the railroad is "the foundation of an interest" in the cars and engines to be acquired for its use.

"If the rolling stock on the road should be removed," says McLean, J., in the case of *Coe* v. *Hart*, "it would defeat the liens of creditors to many millions of dollars, and put an end to the construction, if not to the maintenance of railroads." In the case of *Ludlow* v. *Hurd*, 6 Am. L. Reg., 493, Storer, J., remarks : — "It is very clear that we must regard it (the rolling stock,) as appurtenant to a railroad ; it is necessary for the working of it that all this species of property should become a part of the road itself. It is essential to its use ; and if denied, it is destructive to the purpose for which it was built." And in the case of *Phillips* v. *Winslow*, before cited, the Court say that, in order to render the mortgage of the railroad effectual, "it is necessary that it should embrace all such future acquisitions of the company as are proper accessions to the thing pledged, and essential to its enjoyment."

That a mortgage of a railroad and the franchises of the company, with all the rolling stock then owned and to be afterwards acquired and placed on the road, will create a valid lien upon cars and engines subsequently purchased,

there would seem to be no longer any doubt. Redfield on Railways, § 235, notes 21 to 24. Pierce's Am. Railroad Law, 531; Am. Law Reg., July 1863, 527.

The decisions sustaining such mortgages are not understood to be in conflict with those in which other mortgages of such property have not been upheld. The general rule, that property not *in esse* cannot be conveyed, is not abrogated. Nor will such mortgages be upheld in equity, any more than at law, unless they are within some of the exceptions to the rule. But, if a mortgage is within any of the exceptions it will be sustained, and the parties will be entitled to appropriate remedies.

What remedies will be open to them must depend upon the circumstances of each case. In *Holroyd* v. *Marshall*, 9 Jur. N. S., 213, recently decided by the House of Lords, a registered mortgage of machinery in a mill, together with all that should afterward be placed therein in addition to, or in substitution for that which was there at the time, was held to have created a valid lien upon the portion afterwards purchased, from the time when it was brought within the terms of the grant. And the rights of the mortgagee were sustained in equity, on the ground that the mortgager, as soon as he purchased the additional machinery and put it into the mill, held it in trust for the mortgagee. Whether we should uphold such a mortgage, is a question upon which it is unnecessary to express any opinion. The case seems to be in·conflict with that of *Moody* v. *Wright*, 13 Met., 17. But in those cases in which a mortgage of such property is valid, there would seem to be no doubt that it can be enforced·in equity as a case of trust.

It has been suggested by counsel that, if the mortgage in the case at bar can be supported in equity, it cannot be in this suit at law. We have already seen that this action of trover must·fail, because it is not an appropriate one in which to try the question of title. But, if it were otherwise, the mortgage being sustainable in equity, the result would be the same. The property was in the custody of the

Court, upon a bill in equity, which is still pending, brought for the purpose of determining the rights of all persons to all the property mortgaged.   The suit at law is incidental to the bill in equity, having been brought by special permission of the Court.   It cannot be permitted to defeat the proceedings in equity, in regard to any property embraced in the mortgage.   If the equitable title is in the assignees of the mortgage, and they, or the *cestuis que trust,* are seeking to enforce their rights by a bill in equity, the property being in the hands of a receiver, it would be strange indeed if the whole proceedings could be defeated by the assertion of the legal title subject to the mortgage.   The bill in equity having been commenced first, and the property taken possession of under it, all incidental claims, whether by a suit at law or otherwise, are merely interlocutory.   Upon whatever property the bill is finally sustained, it will operate to convert *equitable* into *legal* titles.   Therefore no suit at law, however appropriate, could be sustained for the possession of any property to which the trustees have an equitable title.

Upon the whole case, we are of the opinion that the mortgage to Myers created a valid lien upon the engines and cars as they were purchased and placed upon the road for the purpose of equipping it; and that the holders of the bonds secured by that mortgage will be entitled, if they claim it, to have the trust enforced, not only against the railroad, but against the rolling stock subsequently acquired.

*Plaintiffs nonsuit.*

Appleton, C. J., Kent, Walton and Dickerson, JJ., concurred.