CHARLES R. FROST *et al.*

*v.*

GALESBURG, ETHERLY AND EASTERN RAILROAD Co. *et al.*

*Filed at Ottawa June 8, 1897.*

1. MORTGAGES—*when mortgage by railroad company operates on after acquired property.* A mortgage given by a railroad company to secure its bonds, which declares that it shall include all property acquired or to be acquired, operates upon after-acquired property as soon as it is obtained.

2. CONTRACTS—*construction of a contract to purchase right of way—agency.* A contract by which a party agrees to purchase the right of way for a railroad company, "the title to rest in said railroad company," operates to create such party the agent of the company, and a delivery to him of the deeds to the land purchased is a valid delivery to the company.

3. CONTRIBUTION—*when equity of contribution arises.* The equity of contribution arises where one of several parties liable for a common debt or obligation discharges the same for the benefit of all.

4. SAME—*when contribution cannot be enforced.* A bill cannot be maintained in equity to enforce from innocent holders of first mortgage bonds of a railroad company, transferred to them by a construction company to secure a *bona fide* indebtedness, contribution to parties who purchased the right of way after the execution of the mortgage, which covered after-acquired property, for loss occasioned by breach of the construction company's contract to deliver to such parties first mortgage bonds sufficient to cover the expense of purchasing the right of way.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Knox county; the Hon. JOHN J. GLENN, Judge, presiding.

The Galesburg, Etherly and Eastern Railroad Company was organized April 6, 1894, with a capital stock of $150,000, for the purpose of building a line of railroad from Wataga, on the line of the Chicago, Burlington and Quincy railroad, in Knox county, to the mines of the Galesburg Coal Company,—a distance of about twelve miles. At the same time the Brown & Windsor Construction Company was formed, for the purpose of procuring the right of way and constructing and equipping the road. On April 24 the Galesburg Coal Company of the first part, the construction company of the second part, and W. H. Bates, Samuel L. Charles and Robert Frost's Sons of the third part, entered into an agreement in writing, by the terms of which said construction company agreed to construct the railroad, erect depots and purchase a locomotive and other necessary equipments, and have the line in operation on or before July 1, 1894. The third party agreed to furnish the money to purchase the right of way if it could be done, and if not, procure it by condemnation, paying for the same, the "title to rest in said railroad company," and to guarantee the contract of the party of the second part with the Illinois Steel Company for the purchase of rails to be used in the construction, in a sum not exceeding $30,000, the party of

the second part to deliver to them "the first mortgage, twenty-year, six per cent gold bonds of said railroad at seventy-five cents on the dollar, in an amount equal to the sum expended for right of way and guaranteed contract for rails; also, as additional collateral, the entire stock of the railroad company." The second party was to pay for said rails and keep the third party harmless, failing in which its rights under the contract were to become forfeited to the latter.

On May 4 Henry Harms and J. S. Spikings entered into an agreement in the nature of a sub-contract with the construction company to build the railroad and furnish the material and do the work, for which the construction company agreed to pay them $45,000, to be evidenced by collateral notes of the construction company, secured by $60,000 of the first mortgage bonds of the railroad company to be held as collateral, the notes and bonds to be delivered as the work progressed. On May 5 the railroad company issued its two hundred and forty first mortgage bonds of $500 each, payable in twenty years, with interest payable half-yearly at six per cent per annum, and at the same time executed its deed of trust to the Royal Trust Company of Chicago "on all its railway property of every kind, *acquired and to be acquired,* to secure the payment of the said bonds." These bonds passed into the hands of the construction company.

On June 6 only a part of the right of way had been procured, and it became apparent that the road could not be completed by July 1, as stipulated in the contract of April 24, but the parties of the third part having then guaranteed the contract with the steel company for rails, a supplemental agreement of that date was entered into, which, after reciting the terms and conditions of the tripartite contract, stipulated that to carry out the spirit of said contract the construction company deposited with and delivered to the said party of the third part $40,000 face value of the first mortgage bonds of said railroad

company, and $149,500 face value of the stock of said railroad company, and *agreed that in the future, and as soon as it could be done,* there should also be deposited with and assigned to the party of the third part an additional amount of said bonds, at seventy-five cents of the face or par value thereof, to equal all the money paid out in securing the right of way for the railroad, as security for the faithful performance of the agreement of the construction company, and, in the event of the failure of the construction company to perform its agreements, the third party was authorized and empowered to sell said securities or any part thereof, the proceeds, after the payment of the expenses of sale, to be applied to save the parties of the third part harmless on account of said guaranty and on account of money advanced by them for right of way, the balance, if any, to be returned to the construction company.

The parties of the third part continued to obtain the right of way and completed the same about August 17, but the construction company failed to deliver to them any additional bonds. On the contrary, it hypothecated the whole of them, as follows: June 6, to the Home National Bank of Chicago, $12,000, to secure its notes of $5000; October 8, $8000, to secure its other note of $5000; and to Henry Harms and J. S. Spikings $60,000, to secure them upon their construction contract of May 4. Thus, Samuel L. Charles and Robert Frost's Sons, who had succeeded to all the rights of W. H. Bates, held $40,000, the bank $20,000, and Henry Harms, who succeeded to the interest of Spikings, $60,000, being the whole of the $120,000, or two hundred and forty bonds issued. The deeds of release for the right of way were not turned over to the railroad company and were not recorded.

Default having been made by the railroad company in the payment of interest on these bonds, Robert Frost's Sons and Samuel L. Charles filed their bill in the circuit court of Knox county to foreclose the mortgage, making

the railroad company, the construction company, the Home National Bank and Henry Harms, with others, defendants. The bill set up "that complainants and one William H. Bates furnished all the means to pay for and procure the right of way for said Galesburg, Etherly and Eastern railroad, and had conveyances thereof made to the said railroad company, but such conveyances have never been delivered to the company and are held by complainants, who are now the joint owners of the whole claim for means so furnished to pay for and procure the right of way, the said Bates having sold and transferred his interest therein to said Robert Frost's Sons; that the amount actually paid for right of way to owners of the soil and others interested therein was and is $14,692.03, and in addition to that sum there was paid out by the said parties, and the claim therefor is now owned by the complainants, in expenses legitimately and necessarily attending the procuring of said right of way, the sum of $659.77, making a total of $15,351.80 so paid for the right of way which said railroad company now occupies and uses with their said railroad, and no part of said sum has been repaid to those who so paid for said right of way, or to the complainants, who are now the owners of the whole claim therefor; that under the facts of this case complainants are entitled to a first lien on said right of way and road-bed situated thereon, to secure to them the payment of the money so paid out for said right of way, and legal interest thereon from the time the same was so paid out for the said right of way and for the necessary expenses attending the procuring thereof." The bill prayed "that an accounting be taken of the amount paid out for right of way and due to complainants, with expenses and legal interest, and that the same be declared a first lien on said railroad and all its appurtenant property, and unless the sum found to be due, with legal interest, be paid to complainants, that said railroad property be sold as aforesaid, and out of the proceeds,

after paying costs of suit and sale, the said sum so due to complainants for money expended in procuring right of way be first paid in full."

The bank and Harms, by their several answers, denied complainants' right to the relief thus sought, and the only controversy on the hearing was upon that issue. The circuit court found that complainants had paid out for right of way $15,351.36, and that they should have had, under the terms of the contract with the construction company, $20,468.40 of the bonds, "and in equity are deemed to have received that quantity of the bonds, and not having in fact received them, the defendant Harms, with the Home National Bank, must from the proceeds of sale *pro rata* with plaintiffs their proportionate share of this amount from the proceeds of the sale of the mortgaged property," and decreed accordingly. On appeal the Appellate Court for the Second District reversed that decree and remanded the cause, with directions to the circuit court to render a decree disallowing the claim of complainants for money paid out for right of way, from the proceeds of the mortgaged property. From that judgment this appeal is prosecuted.

J. M. RIGGS, for appellants.

KNICKERBOCKER & SMITH, (JOHN W. SMITH, of counsel,) for appellee Henry Harms.

WINSTON & MEAGHER, (SILAS H. STRAWN, of counsel,) for appellee the Home National Bank of Chicago.

Mr. JUSTICE WILKIN delivered the opinion of the court:

The only question presented for our decision is, whether appellants are, under the allegations of their bill and the proofs in the record, entitled to a first lien on the mortgaged property for money paid out by them for right of way and expenses incurred in procuring same, as against appellees, the Home National Bank and Henry Harms.

There is nothing in the bill to indicate the head of equity jurisdiction under which the complainants claim the relief prayed for, and we are unable to discover any principle upon which it can be sustained. The circuit court seems to have treated the bill as one to enforce the performance of the agreement of the construction company to deliver to complainants bonds at seventy-five cents on the dollar to secure them for expenditures in obtaining the right of way, the decree treating that amount of bonds as actually delivered, but only allowing complainants a *pro rata* part of them. It is not pretended that any such case is made by the bill or supported by the evidence. The Appellate Court, in its opinion, discusses the proceeding as one to enforce a vendor's lien for the right of way; but that theory is repudiated by counsel for appellants, and their right to relief placed upon the doctrine of contribution, the position being stated thus: "The right of each to the bonds respectively held by them relates to the date of the mortgage. At that time the railway company had no title to the land upon which the road was built. Appellants and appellees were co-mortgagees of a property to which the mortgagor had no title whatever. The several holders of the outstanding, adverse title might have brought ejectment and ousted the railway company. The superstructure and franchises of the road would have been practically worthless without the right of way. Appellants bought in and paid for the adverse title, and the purchase inured to the benefit of each of the co-mortgagees in the proportion in which each held mortgage bonds. Upon clear, equitable grounds appellants are entitled to contribution from appellees."

The attempt is to liken the case to one in which one joint owner removes a burden from the common property, which inures to the benefit of all, or makes advances of his own means to preserve the joint property. "The equity for contribution arises when one of several parties

who are liable to a common debt or obligation discharges the same for the benefit of all." (Bispham's Principles of Equity, sec. 328.) The doctrine is frequently applied between tenants in common or joint holders of property, but we are unable to see how, under the facts of this case, it can be availed of by appellants. The money paid by them for right of way was not for the purpose of removing a prior incumbrance upon the mortgaged property, but in pursuance of their contract with the construction company. The validity of the mortgage or trust deed conveying the right of way, with other railroad property, in no way depended upon the payment of that money. The mortgage, when executed, legally conveyed all the railroad property of the mortgagor of every kind, acquired "*and to be acquired.*" A mortgage by a railroad company to secure bonds, which declares it shall include all property acquired and to be acquired, operates upon after-acquired property as soon as it is obtained. Such is the settled law of the Federal courts and generally of State courts as well. 1 Jones on Mortgages, 152, and cases in notes 2 and 3; 2 Elliott on Railroads, sec. 497, and cases in note 5.

The contention that the right of way was not in fact after-acquired property amounts to saying that it was never acquired by the railroad company, and that position is wholly irreconcilable with the theory of complainants' bill, because, in so far as it seeks to enforce the lien as security for the bonds held by them, it is treated as a valid mortgage upon that as well as all other railroad property. Moreover, the position that the title to the right of way did not rest in the railroad company because the deeds were never delivered to it cannot be sustained. Appellants, by their agreement, undertook to obtain the right of way for the railroad company, "*the title to rest in said railroad company.*" By this agreement they became the agents of the company to obtain these deeds of release, and it will scarcely be denied that a

delivery of them to such agents became, in law, a valid delivery to the company, the grantee. Clearly, the title to each piece of right of way vested in the railroad company as those deeds were executed to it and delivered to appellants, and when the bill was filed all of the right of way was after-acquired property, and had become subject to the lien of the mortgage. The fact that the deeds were not recorded is immaterial. It is not true, as a matter of fact, that the right of way was bought and paid for for the benefit of the holders of the bonds thereby secured.

It is impossible to escape the conclusion, upon this record, that appellants are simply seeking to visit the consequences of the construction company's failure to perform its agreement upon innocent third parties. It is nowhere alleged in the bill, nor is there any evidence tending to show, that the Home National Bank or Henry Harms in any way contributed to the breach of that contract, or that they even had notice, at the time they accepted their bonds, that the contract between the construction company and appellants existed or had not been fully performed. They are charged with no fraud or collusion whatever, and the facts proven are wholly consistent with their perfect good faith in accepting the bonds, which were delivered to them as security for debts *bona fide* due them. There is no principle upon which they can be held liable to contribute for the loss which appellants may have sustained by the failure of that company to deliver the bonds contracted for by it with appellants.

We have carefully considered the extended argument of counsel for appellants, and are clearly of the opinion that on this branch of the case the bill is without equity, and that the judgment of the Appellate Court reversing the decree of the circuit court is right. It will accordingly be affirmed.                    *Judgment affirmed.*