## GUARANTY TRUST CO. OF NEW YORK v. MINNEAPOLIS & ST. L. R. CO. et al., and six other cases.

District Court, D. Minnesota, Fourth Division. November 10, 1928.

On Settlement of Final Decree, January 8, 1929. Nos. 299, 290, 367, 368, 455, 456, 460.

Davis, Polk, Wardwell, Gardiner & Reed, Edwin S. S. Sunderland, and Thos. O'Gorman FitzGibbon, all of New York City, and Kellogg, Morgan, Chase, Carter & Headley and Warren S. Carter, all of St. Paul, Minn., for complainant Guaranty Trust Co.

Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., for complainant Minneapolis Steel & Machinery Co.

Washburn, Bailey & Mitchell, of Duluth, Minn., for Intervener Duluth Boiler Works et al.

Fowler, Carlson, Furber & Johnson, of Minneapolis, Minn., for Intervener H. H. Sheriff et al.

Mortimer H. Boutelle, of Minneapolis, Minn., for Intervener Webster Lumber Co.

White & Case and Jesse E. Waid, all of New York City and Kingman, Cross, Morley & Cant, and Kenneth Taylor, all of Minneapolis, Minn., for New York Trust Co. and Bennett Committee.

Larkin, Rathbone & Perry, Henry V. Poor and James L. Banks, Jr., all of New York City, and F. G. Ingersoll, of St. Paul, Minn., for Central Union Trust Co.

Alexander & Green and James H. McIntosh, all of New York City, and Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., for Bankers' Trust Co.

Taylor, Blanc, Capron & Marsh, of New York City, and Boyesen, Otis & Faricy, of St. Paul, Minn., for Farmers' Loan & Trust Co.

Charles W. Bunn and D. F. Lyons, both of St. Paul, Minn., for Northern Pac. Ry. Co.

Cadwalader, Wickersham & Taft, William Lloyd Kitchel and Paxton Blair, all of New York City, and Sanborn, Graves & Andre, William G. Graves, and J. Neil Morton, all of St. Paul, Minn., for Perkins Committee.

Cook, Nathan & Lehman and Frederick F. Greenman, all of New York City, and O'Brien, Horn & Stringer, of St. Paul, Minn., for Bache Committee.

Donald Evans, of Des Moines, Iowa, for Minneapolis & St. L. R. Co.

M. M. Joyce, of Minneapolis, Minn., for Receiver of Minneapolis & St. L. R. Co.

BOOTH, Circuit Judge. This is a hearing on exceptions to the report of the special master covering six mortgage foreclosure cases, to wit: In Equity No. 299, Guaranty Trust Company of New York, as Trustee under the Refunding and Extension Mortgage of the Minneapolis & St. Louis Railroad Company, dated January 1, 1912, v. Minneapolis & St. Louis Railroad Company et al.; In Equity No. 367, Central Union Trust Company of New York, as Trustee under the First and Refunding Mortgage of the Iowa Central Railway Company, dated March 1, 1901, v. Minneapolis & St. Louis Railroad Company et al.; In Equity No. 368, Central Union Trust Company of New York, as Trustee under the First and Refunding Mortgage of the Minneapolis & St. Louis Railroad Company, dated March 1, 1899, v. Minneapolis & St. Louis Railroad Company et al.; In Equity No. 455, Bankers' Trust Company, as Trustee under the First Mortgage of the Iowa Central Railway Company, dated August 1, 1888, v. Minneapolis & St. Louis Railroad Company et al.; In Equity No. 456, New York Trust Company, as Trustee under the First Consolidated Mortgage of the Minneapolis & St. Louis Railroad Company, dated November 2, 1894, v. Minneapolis & St. Louis Railroad Company, et al.; In Equity No. 460, Central Union Trust Company of New York, as Trustee under the First Mortgage of Des Moines & Fort Dodge Railroad Company, dated January 1, 1905, v. Minneapolis & St. Louis Railroad Company, et al.

The mortgages in foreclosure all cover some portion of the railroad system of the Minneapolis & St. Louis Railroad Company.

The special master was appointed in each of the several causes, but, inasmuch as the evidence in the cases was largely interwoven, a consolidated report was made with the consent and for the convenience of all parties interested.

The findings of the special master touching the validity of each of the six mortgages in question, the particular line or lines of railway, and other real estate covered by each, the defaults occurring under each mortgage, the amounts due upon each, and the conclusion that there should be sales of the mortgaged property under each of the mortgage foreclosures respectively, are all practically assented to by the several parties. The disposition made by the special master of the Keithsburg bridge near Keithsburg, Ill., on the line of the Iowa Central, and the disposition of the White Bear Branch of about 13 miles of railway extending from White Bear to East Minneapolis, is questioned by the parties immediately interested in those properties respectively. But the main controversy is between the various mortgagees relative to the allocation of the equipment made by the special master to the several mortgages. To the special master's findings in respect to this matter more than 100 exceptions have been taken. These numerous exceptions may, however, be grouped around a comparatively few questions.

A bare outline of the history of the railroad system, together with a few of the more important dates, will tend to clarify the discussion of the questions involved. The original company was incorporated under a special act of the Legislature of the Territory of Minnesota, dated March 3, 1853, under the name Minnesota Western Railroad Company. The name was changed in 1870 by authority of the Legislature to Minneapolis & St. Louis Railway Company. In the present litigation this company is called Minneapolis Company No. 1. By February 1, 1877, it had acquired a line of road extending from Minneapolis, Minn., to Albert Lea, Minn., and thence to the state line between Minnesota and Iowa, a distance of approximately 121 miles. On that day the company made a mortgage to the Farmers' Loan & Trust Company to secure bonds amounting to $1,100,000, of which $950,000 are outstanding. This mortgage is called in the present litigation the Merriam Junction-Albert Lea mortgage. It is the only one of the seven mortgages now on parts or on the whole of the system which is not now in foreclosure. This mortgage covered the line of railroad running from Minneapolis to Albert Lea, and thence to the Iowa-Minnesota state line; also the line of railroad running from White Bear Lake Junction to East Minneapolis; also other property.

In April, 1881, Minneapolis & St. Louis Railway Company No. 1 and three other railroad companies, viz.: Minnesota & Iowa Southern, Minneapolis &.Duluth, Ft. Dodge & Ft. Ridgely, consolidated their properties, stock, and franchises by authority of the Legislature, forming a new company under the laws of Minnesota and Iowa, but still under the name Minneapolis & St. Louis Railway Company. This company is called in the present litigation Minneapolis Company No. 2.

June 28, 1888, a receiver was appointed of the properties of Minneapolis Company No. 2 by the state district courts of Hennepin county, Minn., and of Webster county, Iowa, in the foreclosure suits brought by Seibert, trustee of the Improvement and Equipment mortgage which had been executed by said company October 12, 1882. The property was sold October 11, 1894, under foreclosure decree and purchased by F. P. Olcott for a committee. Final decree was entered October 31, 1894. The assignees of Olcott organized a new corporation under the laws of Minnesota, with the name of Minneapolis & St. Louis Railroad Company. This is called in the present litigation Minneapolis Company No. 3.

Under date of November 2, 1894, Minneapolis Company No. 3 executed what is known as the First Consolidated mortgage. This mortgage covered as a first lien lines of railroad then owned by the company, approximately 245 miles in length; and, as a subordinate lien, the remaining lines of railroad and other property owned by the company, but subject to the Merriam Junction-Albert Lea mortgage as to the property covered by the latter. The First Consolidated mortgage authorized bonds to the amount of $10,000,000, but only $5,282,000 were issued, and are now outstanding. This is one of the six mortgages now in foreclosure.

January 19, 1895, Minneapolis Company No. 3 conveyed so much of its line of railway and property as was located in Iowa to the Minneapolis & St. Louis Railroad & Telegraph Company, a newly formed corporation of Iowa.

February 1, 1895, the two last named companies by articles of consolidation conveyed all their respective lines of railway, franchises, and properties to a new company formed under the laws of the states of Minnesota and Iowa, and named the Minneapolis & St. Louis Railroad Company. This company is called in the present litigation Minneapolis Company No. 4.

March 1, 1899, Minneapolis Company No. 4 executed its mortgage known as the Minneapolis & St. Louis First and Refunding mortgage. Of the $25,000,000 bonds authorized, $13,244,000 were issued and are outstanding. This mortgage covered as. a first lien a line of railway running from Morton in the state of Minnesota to Watertown in the state of South Dakota, a distance of about 123 miles; also a line of railway running from Winthrop in the state of Minnesota to Storm Lake in the state of Iowa, a distance of about 153 miles. It also covered as a subordinate lien the remaining lines of railway owned by the company. This is also one of the six mortgages in foreclosure.

January 1, 1912, Minneapolis Company No. 4 acquired by purchase the lines of railway of the Iowa Central Railway Company, together with its franchises, equipment, and other property. The principal lines of railway thus acquired extended from the state line between Minnesota and Iowa to Oskaloosa, and thence to Albia, in Iowa; also from Oskaloosa to Iowa Junction near Peoria, Ill. There were also numerous branches. The total mileage was approximately 503 miles. These lines of railway of the Iowa Central Railway Company were subject to two mortgages: .The Iowa Central First, dated August 1, 1888, under which bonds to the amount of $7,650,000 had been issued ,and were outstanding; the Iowa Central First and Refunding, dated March 1, 1901, under which bonds to the amount of $7,156,000 had been issued and were outstanding. These two mortgages are included in the six now in foreclosure.

On January 1, 1912, Minneapolis Company No. 4 also acquired·by conveyance the lines of railway, franchises, and properties of the Minnesota, Dakota & Pacific Railway Company. These lines extended from Watertown, S. D., to Conde, thence to Le Beau in South Dakota; also from Conde to Leola, both in South Dakota. The total mileage thus acquired was approximately 229 miles.

On January 1, 1912, Minneapolis Company No. 4 also executed a mortgage known as the Refunding and Extension mortgage. This mortgage covered as a first lien the lines of railway acquired from the Minnesota, Dakota & Pacific Railway Company, together with certain other property. It also covered as a subordinate lien the other lines of railway and property owned by the company. Of the $75,000,000 bonds authorized under this mortgage, $8,985,000 have been issued either to owners for value or as collateral security for loans; $318,044.12 are held in the treasury of the company. This mortgage also is one of the six in foreclosure.

August 9, 1915, Minneapolis Company

No. 4 acquired by purchase the railroad, franchises, and properties of the Des Moines & Fort Dodge Railroad Company. The mileage thus acquired was approximately 138 miles. These properties of the Des Moines & Fort Dodge Railroad Company were subject to the lien of a mortgage dated January 1, 1905. Bonds under this mortgage to the amount of $3,072,000 have been issued and are outstanding. This mortgage also is one of the six now in foreclosure.

May 10, 1916, Minneapolis Company No. 4 was consolidated with the Iowa Central & Western Railway Company, a corporation of the state of Iowa, owning a line of railway extending from Belmond to Algona, a distance of approximately 37 miles. The new consolidated company thus formed was a corporation of the state of Iowa. It is called in the present litigation Minneapolis Company No. 5.

The foregoing outline is not intended to be an exhaustive statement of the property covered by the several mortgages respectively.

All of the above-mentioned mortgages now in foreclosure covered equipment in addition to the lines of railway specified. In some instances the equipment was specifically identified; in others it was covered by general language. As new equipment was purchased from time to time, it was used indiscriminately on the railway system wherever it was needed. Much of the equipment was purchased by the common method of equipment trusts, and in numerous instances the equipment trust certificates were taken up and paid out of moneys derived directly or indirectly from the sale of bonds under some one of the several mortgages. In view of this procedure, it was a natural consequence that the trustees under the several mortgages in foreclosing the mortgages have found it no easy task to identify the equipment belonging to each of the several mortgages.

In attempting to reach a solution of the complex situation, several questions have been met and answered by the special master in his report. It is around these questions that most of the exceptions to his report group themselves.

### After-Acquired Property Clauses.

One question which arises is, which of the several mortgages in foreclosure have after-acquired property clauses. The special master has found specifically upon what equipment each of the mortgages became a first lien at the time of its execution, and how

much of that equipment was in existence on September 30, 1926, the arbitrary date agreed upon for inventory and appraisal. The special master has also specifically found what later-acquired equipment came under each mortgage as a first lien, and what part thereof remained in existence on September 30, 1926. The special master has therefore necessarily found which of the mortgages contained an after-acquired property clause; and also whether the operation of such clause was later terminated, and, if so, the date of termination. All this is explained by the special master in his memorandum accompanying his findings. It is clear upon the whole record that the special master found that the Minneapolis & St. Louis First Consolidated, the Iowa Central First, and the Des Moines & Fort Dodge First have no after-acquired property clauses. It is clear also that the special master found, conceding that the Minneapolis & St. Louis First and Refunding and the Iowa Central First and Refunding have after-acquired property clauses, yet that the operation of those clauses was terminated on a later date. It is still further clear that the special master found that the Minneapolis & St. Louis Refunding and Extension has an after-acquired property clause, and that its operation has never been terminated.

These findings are severally challenged, so that it will be necessary to consider each of the mortgages separately. Before so doing it will be helpful to consider a few propositions which apply equally to all of the mortgages.

■ That a mortgage may legally include after-acquired property clauses has been settled since the decision in Pennock v. Coe, 23 How. 117, 16 L. Ed. 436.

■ That a mortgage will not be construed as covering after-acquired property, unless the intention of the parties to that effect appears plainly from the language of the mortgage itself, is also well settled by authority. 41 C. J., p. 373; 4 Thompson on Corporations (3d Ed.), pp. 228, 229; 5 Cook on Corporations (8th Ed.) p. 3849; Elijah Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637; Maxwell v. Wilmington Dental Mfg. Co. (C. C.) 77 F. 938; In re Adamant Plaster Co. (D. C.) 137 F. 251, 256.

That the intention of the parties is the controlling factor is so elementary that citation of authorities is unnecessary.

In the light of these principles let us examine the three mortgages which the special master has held contain no after-acquired property clause.

### The Minneapolis & St. Louis First Consolidated Mortgage.

█ The authority for the railroad company to include an after-acquired property clause in the mortgage may be conceded. The statutes of both Minnesota and Iowa authorize the inclusion of such a clause. The vital question is whether such a clause has been included.

This mortgage in its general granting paragraph contains the following language: " *. * * Doth grant, bargain, sell, assign, convey, transfer, pledge and set over, unto the said party of the second part and its successors and assigns forever, all the railways, equipment, property, rights, franchises, premises, privileges and immunities now owned by the Railroad Company, the said railways now owned, constructed and in operation by the Railroad Company, together with the other property, real, personal and mixed, intended by these presents to be transferred and conveyed, being more particularly described as follows."

Then follows in paragraphs 1 to 16, inclusive, a particular description of the equipment and railway lines. Paragraph 17 of the mortgage reads as follows:

"XVII. All bridges, depots, station houses, engine houses, car houses, freight houses and car or machine shops or other buildings; all fences, trestles, bridges and culverts; all kinds of machinery and tools owned by the Minneapolis and St. Louis Railroad Company; all locomotives, engines, tenders, passenger or freight cars, and other rolling stock or equipments, and all fuel, material and other supplies of the said Railroad Company, which structures, buildings, machinery and supplies, were or have become or may hereafter become connected with or necessary, useful, or convenient for the use, maintenance and operation of the railways and premises by this mortgage conveyed, or either of them, whether the same were at the date of this mortgage held and owned, or which may be hereafter acquired by the said Railroad Company."

Paragraph 18 contains the following language:

"Al the franchises, corporate or otherwise, rights, privileges, immunities and exemptions of the said The Minneapolis and St. Louis Railroad Company, now owned or which may be hereafter acquired, in connection with or relating to the said railways by this mortgage conveyed, or any of them; together with all and singular the tenements and appurtenances belonging, or in anywise appertaining to the said property and premises hereby mortgaged, and the reversions, remainders, and also all the estate, right, title and interest whatsoever, as well at law as in equity, of the said The Minneapolis and St. Louis Railroad Company, of, in and to the same; but this mortgage is not intended to include or to constitute a lien upon any future branches or extensions which may be constructed or acquired after the date of this mortgage."

Passing from the paragraphs enumerating the properties conveyed, we find among the covenants the following:

"Fifth. * * * the trustee shall have full power * * * upon written request * * * to * * * release from the lien of this mortgage any property * * * but any property which may be acquired for permanent use in substitution for any so released and conveyed shall thereupon become subject to the lien of this mortgage. * * *"

"Seventh. If default shall be made * * * party of the second part (the trustee) shall enter into * * * possession * * * operate the said railways, make from time to time all such repairs or replacements as it * * * may deem judicious."

"Twelfth. The said party of the first part * * * doth covenant * * * that * * * (it) will * * * upon request * * * execute * * * such further * * * deeds * * * as shall be reasonably advised * * * to assure and confirm to the said party of the second part, or its successors, all and singular the property and estate, real and personal, hereinbefore described, and hereby intended to be granted, and so as to render the same, and especially such portions thereof as shall be hereafter acquired by the said party of the first part, or its successors, available for the security and satisfaction of the said bonds, according to the intent and purpose herein expressed."

It is plain from the above excerpts from the mortgage that the general granting language of the mortgage did not contain an after-acquired property clause, but, on the contrary, contained the words "now owned," which of themselves strongly tend to negative the idea that the mortgage was intended to include after-acquired property. The language of paragraph 17 of the enumerated property tends to the same conclusion. The paragraph purports to describe several classes of property, viz. buildings, structures, machinery, and tools, rolling stock or equipment, and supplies. Even assuming for the purpose of argument that the language of

this paragraph 17 may have the effect of enlarging or modifying the scope of the words "now owned," used in the general granting language, yet the language of paragraph 17, so far as it relates to after-acquired property, is expressly limited to classes of property other than equipment. It reads, "which structures, buildings, machinery and supplies," etc., clearly omitting the class "equipment" from the category of possible after-acquired property. If it be said that such a construction of paragraph 17 is narrow and technical, the answer is that railroad mortgages are, and for years have been, drawn by men highly skilled in that branch of the legal profession, by men acquainted with, and accustomed to make use of, accuracy of expression. The omission from a category of railroad property of such an important class as equipment cannot be presumed to have been an inadvertence. The natural inference is rather that the omission was intentional. Reasons might be readily suggested why the omission was highly desirable.

Turning to the language of paragraph 18, it is clear that the words "now owned or which may be hereafter acquired," as used therein, are limited in application to "franchises, rights, privileges, immunities and exemptions," which are mentioned immediately preceding. The word "appurtenances," occurring later in the same paragraph, cannot fairly be construed as including equipment. The rolling stock of a railroad is not aptly described as an appurtenance to a line of railway, any more than elevator or a hotel property. Humphreys v. McKissock, 140 U. S. 304, 11 S. Ct. 779, 35 L. Ed. 473; Guaranty Trust Co. v. Atlantic, etc., R. Co. (C. C.) 132 F. 68; Nielson, Benton & O'Donnel v. Iowa Eastern R. Co., 51 Iowa, 184, 1 N. W. 434, 33 Am. Rep. 124; Hinchman v. Point Defiance Co., 14 Wash. 349, 44 P. 867. More properly the word "appurtenance," when used in connection with a line of railway, is used to describe something akin to the line of railway; e. g., a spur, a siding, a switchyard, a branch, an extension. That the word "appurtenances" was used in paragraph 18 with this latter meaning would seem clear from the clause at the end of the paragraph, which expressly provides that branches or extensions constructed or acquired after the date of the mortgage are not intended to be covered. This provision leads to the inference that the word "appurtenances" had reference to spurs, sidings, etc., rather than to rolling stock.

Turning next to the language contained in the covenants: The excerpt given above from the fifth covenant, on its face, refers to exchange or sale of real estate due to abandonment of a portion of the railway line or a change of location of tracks. The excerpt from the seventh covenant covers simply the bestowal of power on the trustee after default and after taking possession by the trustee. In my judgment, it has no bearing upon the question whether the mortgage when made was intended to cover after-acquired property. The twelfth covenant is simply that the railroad company will, upon request, execute deeds of further assurance to the trustee of property owned by the railroad company at the date of the mortgage and covered by it, and also of such after-acquired property as the mortgage was intended to cover. This twelfth covenant does not purport to determine that the mortgage covers any after-acquired property, but simply states that deeds of further assurance will be given to convey any property to the trustee, if the intent expressed in the mortgage was to cover that particular property, whether already owned at the date of the mortgage or thereafter acquired.

It is also argued that the effect of the statutes of Minnesota (1878 G. S. c. 34, §§ 71–73), as construed in the case of Central Trust Co. v. Moran, 56 Minn. 188, 57 N. W. 471, 29 L. R. A. 212, is to bring after-acquired personal property under the lien of an existing mortgage. The pertinent part of the statutes referred to reads as follows:

"Said mortgages or deeds of trust shall be recorded in the office of the register of deeds of each county through which the road mortgaged or deeded may run, or wherever it may hold lands, and shall be notice to all the world of the rights of all parties under the same; and for this purpose, and to secure the right of mortgagees or parties * * * under deeds of trust so executed and recorded, the rolling stock and personal property of the company properly belonging to the road and appertaining thereto shall be deemed a part of the road, and said mortgages and deeds so recorded shall have the same effect, both as to notice and otherwise, as to the personal, as to the real estate covered by them."

The gist of the decision in the Moran Case was that rolling stock of a railroad covered by a mortgage which also covered the railroad was to be considered part of a unitary property as against an attempted levy by judgment creditors on the rolling stock alone. That decision did not hold or even intimate that the statute in question had the effect of inserting an after-acquired property clause in a railroad mortgage. There is nothing in

that decision which prevents a railroad company from owning rolling stock free from any mortgage, or from covering it with some particular mortgage as it may determine.

The argument that a lien may be inferred upon after-acquired equipment because of the mortgaging of income falls to the ground for one all-sufficient reason, that the mortgage contains no granting clause mortgaging income. There is, it is true, an authority granted in paragraph 7 of the covenants to the trustee after default to take the income and use it, among other purposes, for replacements, etc., but this is far from being the equivalent of mortgaging income.

■ My conclusion is that the ruling of the special master was correct, and that the Minneapolis & St. Louis First Consolidated mortgage has no after-acquired property clause or equivalent language which covers after-acquired equipment. The special master has held, even assuming that the language hereinabove quoted contained in the several paragraphs of the mortgage could be construed as equivalent to an after-acquired property clause, yet that such provision would have been terminated by the consolidation of 1895, and, if it survived that, then by the consolidation of 1916. That such is generally the effect of a consolidation appears to be well established. Atlantic, etc., R. Co. v. Georgia, 98 U. S. 359, 25 L. Ed. 185; Gardner v. Minneapolis & St. L. Ry. Co., 73 Minn. 517, 76 N. W. 282, Id. 177 U. S. 332, 20 S. Ct. 656, 44 L. Ed. 793; Pullman Palace Car Co. v. Missouri Pac. R. Co., 115 U. S. 587, 6 S. Ct. 194, 29 L. Ed. 499; Wabash, St. Louis & Pacific R. Co. v. Ham, 114 U. S. 587, 5 S. Ct. 1081, 29 L. Ed. 235; New York Security, etc., Co. v. Louisville, etc., R. Co. (C. C.) 102 F. 382, 398. I see no sufficient reason for holding that this general rule would not apply in the case at bar, if a finding could be made that the mortgage contained an after-acquired property clause; but in my judgment such a finding cannot properly be made.

### Iowa Central First Mortgage.

■ This mortgage contains in the general granting paragraph the following language:

(1) " * * * And also all machinery and tools now owned or which may hereafter be owned or acquired by the mortgagor, for use in connection with said railways, and all locomotives, tenders, cars and other rolling stock and equipment, and all implements, fuel, materials and supplies now owned or acquired by the mortgagor for the construction, maintenance, operation, repairing and replacing of the said railways."

Also the following:

(2) "Together with all and singular, the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof."

The eighth covenant contains the following:

(4) "The trustee shall also have power to allow the mortgagor, its successors or assigns from time to time, to dispose, according to its or their discretion, of such portion of the equipment, machinery and implements at any time held or acquired for the use of the said railways, as may have become unfit for such use, replacing the same by new, which shall at once be subject to the lien of these presents, without any further conveyance or mortgage."

The fourteenth covenant contains the following:

(5) "The mortgagor shall and will until the bonds secured by this indenture are fully paid, make all necessary repairs and replacements to keep up the property, rolling stock and equipment, hereby conveyed and transferred."

The special master found that this mortgage had no after-acquired property clause. The first excerpt above given from the general granting clause is probably not sufficient, standing alone, to be construed as an after-acquired property clause covering equipment. The words "now owned or acquired" are not the necessary equivalent of "now owned or hereafter acquired." The former may very properly refer wholly to the present; the latter must embrace the future. The question may not be free from doubt, but I am inclined to agree with the special master.

But the second excerpt above given from the general granting clause seems plainly to grant income. A similar power over income is given to the trustee after default by the provision quoted from covenant eighth. Furthermore, the excerpt above given from the fourteenth covenant is plainly a repair and replacement covenant; and, by the excerpt above quoted from the eighth covenant, all replacements become subject to the mortgage. It is true that a covenant to replace, standing alone, cannot be construed as equivalent to an after-acquired property clause, but here we have, in addition, a grant of income under the mortgage; and a grant of income under a railroad mortgage may, under proper circumstances, be construed as the equivalent of an after-acquired property clause covering equipment. Such was the

ruling in Louisville Trust Co. v. Cincinnati Inclined-Plane R. Co. (C. C.) 91 F. 699. Circuit Judge Taft (now Chief Justice of the United States) in rendering his decision in the case, said:

"Let us recur now to the question left open —as to whether the mortgage of the income to accrue from the railway then existing and owned by the mortgagor does not include subsequently acquired rolling stock and machinery used in connection with the railway to earn the income, profits, and tolls accruing therefrom. I think this must be answered in the affirmative. No tolls or income or profits could be earned from the railway without rolling stock and equipment. The mortgage of the income would give the mortgagee the right to take possession of the mortgaged railway upon condition broken, and take and enjoy the income, but no income be earned without the rolling stock then in use upon the railway. As against the grantor, therefore, it must be taken that it intended to mortgage with its railway all the rolling stock owned by it and used by it during the existence of the mortgage from which it would earn an income subject to the mortgage. This is the effect of Justice McLean's reasoning in Coe v. Pennock, 5 Fed. Cas. 1172 [No. 2,942], and of the case of Pullan v. Railroad Co., 4 Biss. 35, Fed. Cas. No. 11,461. See, also, State v. Northern Cent. Ry. Co., 18 Md. 193."

It would appear from the statutes of the state of Illinois (Callaghan's Ill. Stat. vol. 7, p. 6527) and from the decisions of the courts of that state (Frost v. Railroad Co., 167 Ill. 161, 47 N. E. 357) that the Iowa Central Railway Company had authority to mortgage after-acquired property. I reach the conclusion, therefore, from the language of the mortgage as a whole, that at the time the mortgage was executed it was the intention of the parties that it should be a lien on after-acquired equipment owned by it and used by it to produce an income subject to the mortgage. The fact that later on equipment was purchased which was paid for either directly or indirectly by proceeds of bonds issued under a new mortgage would not prevent the lien under the first mortgage from attaching. Mississippi Valley Trust Co. v. Southern Trust Co. (C. C. A.) 261 F. 765; Commercial Trust Co. v. Chattanooga Ry., etc., Co. (D. C.) 281 F. 856.

On January 1, 1912, Minneapolis Company No. 4 took several important steps, enlarging its railway system and reorganizing its financial structure: (1) It acquired by purchase the railway properties and franchises of the Iowa Central Railway Company; (2) it brought about a closure of the Iowa Central First and Refunding mortgage which was a second lien on most of the properties of that company; (3) it brought about a closure of the Minneapolis & St. Louis First and Refunding mortgage, which was a first lien on a portion of the system of Minneapolis Company No. 4 and a subordinate lien on other portions; (4) it purchased the railway lines, properties, and franchises of the Minnesota, Dakota & Pacific Railway Company, which included a mileage of approximately 229 miles; (5) it executed the Refunding and Extension mortgage, which covered the entire system of railways of Minneapolis Company No. 4, including the properties of the Iowa Central Railway Company and of the Minnesota, Dakota & Pacific Railway Company, which it had just acquired— all subject, however, to liens of mortgages prior to the Refunding and Extension mortgage.

At present we are concerned mainly with step 1, the purchase of the properties of the Iowa Central. The deed covering these properties contained the following covenant on the part of the grantee (Minneapolis Company No. 4):

"Fourth. The grantee hereby assumes the due and punctual payment of the principal of and interest upon the bonds and car trust certificates of the Grantor now issued and outstanding as hereinbefore set forth, and assumes the due and punctual performance of all the covenants and conditions contained in the mortgages or deeds of trust and car trust agreements of the Grantor hereinbefore referred to securing the said bonds and car trust certificates, on the part of the Grantor to be done, performed and observed; and the Grantee covenants and agrees with the Grantor that it will duly and punctually pay the principal of and interest upon the said bonds and car trust certificates as the same shall respectively become due and payable, and will duly and punctually perform and observe all the covenants and conditions contained in the said mortgages and car trust agreements of the Grantor on the part of the Grantor to be done, performed and observed, and will execute and deliver all such instruments as may be required by the terms of said mortgages or deeds of trust and car trust agreements or any of them upon the transfer and conveyance to the Grantee of the railroad and property of the Grantor as provided in this indenture."

It is strenuously urged that this covenant had the effect of extending the lien existing on the equipment of the Iowa Central

Railway Company under its first mortgage to equipment acquired by Minneapolis Company No. 4 after its purchase of the Iowa Central Railway Company properties. I cannot agree with this contention. The usual effect of a sale of a railroad property covered by a mortgage having an after-acquired property clause is to terminate the operation of such clause. The selling company ceases to acquire property, and the after-acquired property clause ceases to function. Such a clause in a railroad mortgage does not of itself compel the mortgagor to buy property—much less can it compel a purchaser of a railroad to buy additional property. In the instant case the Iowa Central Railway Company could not contract to mortgage the after-acquired property of another railway company. When new equipment was bought by Minneapolis Company No. 4 after the purchase of the property of the Iowa Central, such new equipment became, not the property of the Iowa Central Railway Company, but of Minneapolis Company No. 4. There is no showing that it was purchased for use on the line of railway formerly owned by the Iowa Central Railway Company, or that it was paid for from the proceeds of any bonds under the Iowa Central First Mortgage or the second mortgage, or out of income accruing from that railroad. Furthermore, it is clear from the steps above recited, taken by Minneapolis Company No. 4 on the same day that it purchased the property of the Iowa Central Railway Company, that it did not intend that any equipment it might purchase in the future should come under the lien of the Iowa Central First Mortgage, except in so far as its obligations compelled.

However, at the date of sale of the properties of the Iowa Central Railway Company to Minneapolis Company No. 4, the Iowa Central Company owned certain equipment, and that equipment was covered by its first mortgage. One of the covenants of that mortgage was that such equipment should be maintained and replaced. In other words, the covenant was that equipment to that value-amount should be kept continually under the lien of the first mortgage. This covenant Minneapolis Company No. 4 assumed and agreed to carry out. In other words, the covenant of the Minneapolis Company No. 4 was that the same value amount of equipment which it purchased from the Iowa Central Railway Company on January 1, 1912, should be continually kept under the lien of the Iowa Central first mortgage, so that the company might continue to earn income.

Equity will consider that as done which ought to have been done. When Minneapolis Company No. 4 after January 1, 1912, purchased new equipment from time to time, it was its duty to set aside as under the lien of the Iowa Central First mortgage so much equipment as was necessary to keep intact the equipment it purchased from the Iowa Central Railway Company January 1, 1912; and, even though Minneapolis Company No. 4 did not do this, equity will consider it as done, and will hold that the lien of the Iowa Central First mortgage continued to cover the same value amount of equipment after January 1, 1912, that it covered on that date.

A similar conclusion is reached from a consideration of the 1916 consolidation agreement. That agreement provided for the assumption by the consolidated company of the obligations of the constituent companies. It is unnecessary to discuss this at length, however, in view of what has been already said in reference to the sale agreement of 1912. No cases have been cited by counsel on either side which in my judgment decide the precise point here involved. The cases cited in support of the proposition that a sale of a railroad property which is covered by a mortgage having an after-acquired property clause terminates the operation of such clause (Wabash, etc., Ry. Co. v. Ham, 114 U. S. 587, 5 S. Ct. 1081, 29 L. Ed. 235; Trust Co. of America v. Rhinelander [C. C.] 182 F. 64; Mississippi Valley Trust Co. v. Southern Trust Co. [C. C. A.] 261 F. 765; Hinchman v. Point Defiance Ry. Co., 14 Wash. 349, 44 P. 867; Commercial Trust Co. v. Chattanooga Ry., etc., Co. [D. C.] 281 F. 856) are cases where the purchaser simply assumed the payment of the mortgage debt. None of them, so far as I have been able to ascertain, were cases where the purchaser not only assumed the payment of the mortgage debt, but also assumed and promised to fulfill all the other obligations of the selling company. This is the feature which distinguishes the case at bar.

My conclusion, therefore, is that the Iowa Central first mortgage did contain an after-acquired property clause, or an equivalent thereof, covering equipment; and that this operated to extend the lien of the mortgage to equipment purchased by the Iowa Central Railway Company up to January 1, 1912. On that date the Iowa Central Railway Company sold all its properties, and ceased to acquire further property, and the after-acquired property provision was terminated by the sale so far as any increase in the value-amount was concerned. Equipment partly paid for up to January 1, 1912, would pro

tanto come under the lien of the first mortgage; and the lien of the Iowa Central First mortgage would extend to and cover so much of the equipment purchased by Minneapolis Company No. 4 after January 1, 1912, as was necessary to keep intact in value the equipment covered by that sale. For quite obvious reasons equity requires that the amount of equipment be measured by value rather than by the number of items. If the parties interested cannot agree on the value of the equipment sold by the Iowa Central Railway Company on January 1, 1912, a re-reference will be made to the special master to ascertain the same.

By this holding no one is defrauded. The Iowa Central Railway Company and Minneapolis Company No. 4 both knew what obligations had been assumed by the latter company by virtue of the contract of sale. When that contract was recorded, the owners of bonds under the Iowa Central first mortgage knew, constructively at least, that their rights would be protected; and the purchasers of bonds under the refunding and extension mortgage knew, constructively at least, the conditions and limitations attaching to equipment covered by that mortgage.

The findings of the special master in respect to this mortgage are modified in accordance with the foregoing views.

The Keithsburg bridge will be considered later.

Des Moines & Fort Dodge First Mortgage.

 This mortgage also, the special master has held, contains no after-acquired property clause. The general language of the granting clause includes the following:

" * * * Does grant, bargain, sell, release, convey, assign, transfer, pledge and set over, unto the Trustee, party of the second part, and to its successors and assigns forever, all the railways, equipment, property, rights, franchises, premises, privileges and immunities now owned by the Railroad Company, being more particularly described as follows."

Included in the description of property is found the following:

" * * * All locomotives, tenders, passenger cars, baggage cars, freight cars and other cars, and all other rolling stock and equipment of every character and description, and all interest in rolling stock and equipment."

Article 2, section 2, of the covenants, contains the following:

"Whenever required by the Trustee, the Railroad Company will grant, convey, confirm, assign, transfer and set over unto the Trustee the estate, right, title and interest of the Railroad Company of, in or to all real and personal estate, corporate rights and franchises which in any way or manner it shall require as appurtenant thereto, or for the use of, the railroad hereby mortgaged."

Article 3, section 2, of the covenants, contains the following:

"In case default shall be made * * * the Trustee * * * may enter into and upon all or any part of the railways, rolling stock, property and premises, lands, rights, interests, and franchises hereby conveyed * * * and conduct the business thereon * * * may maintain and restore, and insure, or keep insured, the rolling stock, tools and machinery, right of way and roadbed, and other property, buildings, bridges and structures erected, or provided for use, in connection with said railways and other premises * * * and it shall be entitled to collect and to receive all tolls, earnings, incomes, rents, issues and profits of the same and every part thereof."

In article 6, section 1, the trustee is given authority to release property covered by the mortgage upon certain conditions. It is then provided as follows:

"Any new property acquired by the Railroad Company in exchange for, or to take the place of, any property released thereunder, ipso facto shall become and be subject to the lien of this indenture, as fully as if specifically mortgaged and conveyed hereby."

Section 2 of the same article reads as follows:

"While in possession of the mortgaged premises the Railroad Company shall also have full power, in its discretion, from time to time, to dispose, free from the lien of this indenture, of any portion of the implements, machinery, rolling stock or equipment embraced within this indenture which may have become unfit for such use, upon replacing the same by or substituting for the same new implements, machinery, rolling stock or equipment, of at least equal value to that disposed of. All such substituted property shall forthwith become and be subject to the lien of this indenture."

It will be seen from the foregoing excerpts that the language of the mortgage is quite largely similar to the language of the Minneapolis & St. Louis Consolidated Mortgage, which has hereinbefore been quoted and considered. There is no after-acquired property clause in the granting language of the mortgage, and no apt words either there

or elsewhere in the mortgage from which an intent to mortgage after-acquired property can fairly be inferred. There is no mortgaging of income. The inclusion of "bills receivable, traffic balances and claims" in the granting clause of the mortgage cannot, in my judgment, fairly be held to be equivalent to a mortgage of income. The language was simply intended to avoid the inconvenience of possible attachments and garnishments; and the language in reference to income in sections 4 and 5, article 2, did not create a lien upon income, but was simply a promise on the part of the mortgagor that it would prevent the accrual of any liens or charges against income which might prevent the mortgagor from meeting its obligations under the mortgage.

From the language of section 2, article 3, above quoted, which simply grants certain powers to the trustee after default in reference to replacement of equipment, it is sought to draw the inference that the mortgagor was under covenant to replace equipment, and that this in some way amounted to an after-acquired property clause. The argument is not persuasive.

The language of sections 2 and 3, article 6, above quoted, is simply to the effect that, if any substitutions or replacements of property were made by the mortgagor, the substituted property should be subject to the lien of the mortgage. In my opinion, the language falls far short of constituting a covenant to make replacements.

Much of what has been said above in reference to the Minneapolis & St. Louis First Consolidated is applicable to this Des Moines & Fort Dodge First mortgage, and need not be repeated.

August 1, 1915, the Des Moines & Fort Dodge Railroad Company sold its lines of railway, properties, and franchises to Minneapolis Company No. 4. The special master has held that, if by any possibility an after-acquired property provision could be spelled into this mortgage, yet the sale of 1915 would have terminated the operation of such a provision. Inasmuch as I think it clear that the mortgage had no after-acquired property clause, I do not deem it necessary to discuss the effect of the sale of August, 1915, or of the consolidation of May, 1916. The allocation of equipment made by the special master to this mortgage meets my approval.

#### Minneapolis & St. Louis First and Refunding Mortgage.

The special master has found that this mortgage contained an after-acquired property clause covering equipment; that the operation of the clause was terminated by the so-called "closure agreement" of January 1, 1912, and, in any event, was terminated by the consolidation agreement of 1916.

Paragraph VII of the granting part of the mortgage contains the following language:

"* * * All the railways, equipment and other property of the Railroad Company which may hereafter be acquired, except that this mortgage shall not constitute a lien or incumbrance upon any railways, property or equipment which shall be acquired by the Railroad Company after all the bonds secured hereby, which are under the terms and provisions of this mortgage to be issued only for extensions, improvements and equipment, shall have been sold or disposed of."

Section 2 of article 2 of the covenants contains the following:

"But nothing in this indenture, expressed or implied, is intended or shall be construed, to limit the right or power of the Railroad Company, hereby expressly reserved, in any manner, except by the use of bonds secured by this indenture, to construct, or to acquire, and to own and hold other lines of railway, or branches, or extensions, or interests therein, or other property, free from the lien hereof, provided that at the time of such construction or acquisition all of the bonds reserved under this mortgage to be issued for extensions, improvements and equipment shall have been sold or disposed of as in this mortgage provided."

Section 7 of the same article reads as follows:

"The Railroad Company will not issue, negotiate, sell or dispose of any bonds hereby secured in any manner other than in accordance with the provisions of this indenture, and the agreements in that behalf herein contained; and in issuing, selling, negotiating, or otherwise disposing of such bonds, from time to time, it will well and truly apply, or cause to be applied, the same or the proceeds thereof to and for purposes herein prescribed, and to and for no other or different purpose."

I do not think that a serious contention can be made that the mortgage did not contain an after-acquired property clause. The real controversy centers around the question whether the operation of the after-acquired property clause was terminated by the closure agreement of 1912. That agreement was entered into by and between Min-

neapolis Company No. 4, the Central Trust Company of New York, trustee under the first and refunding mortgage, and the Guaranty Trust Company, trustee under the refunding and extension mortgage. It recites the existence of the first and refunding mortgage and that Minneapolis Company No. 4 is about to execute the refunding and extension mortgage. It further recites that Minneapolis Company No. 4 has covenanted in the latter mortgage that it would not permit any further issue of bonds under the first and refunding mortgage. The closure agreement then provides as follows:

"First. The Railroad Company waives and relinquishes its right to the authentication and delivery of any First and Refunding Mortgage Bonds, in addition to the $13,244,-000 face value of principal of said bonds now issued and outstanding as hereinbefore set forth, and covenants and agrees with the Trustee and with the Trust Company, jointly and severally, that it will not at any time hereafter request or demand the authentication and delivery, under the said First and Refunding Mortgage, of any such additional bonds, and that it will not issue or suffer or permit to be issued any of such bonds; but any and all bonds not heretofore authenticated and delivered under the said First and Refunding Mortgage shall forthwith upon the execution and delivery of this agreement, be cancelled; the intention and purpose of their agreement being to dispose of all the bonds secured by the First and Refunding Mortgage of the Railroad Company (including the bonds which were under the terms and provisions of said mortgage to be issued only for extensions, improvements and equipment) not heretofore issued and now outstanding."

It was evidently the intent of the parties to that agreement to close the issue of bonds under the First and Refunding mortgage, and to cancel the unissued bonds. One of their purposes in so doing was to terminate the operation of the after-acquired property clause in the mortgage; and they evidently thought this could be accomplished by cancelling the unissued bonds, since, as they construed the mortgage, to cancel the bonds was equivalent to "sell or dispose" of them as provided in paragraph VII of the granting clause of the mortgage.

I have grave doubts whether the words "sold or disposed of" include a cancellation, and this doubt is strengthened by a consideration of other provisions of the mortgage. The words "sold or disposed of" occur also in section 2, article 2 above quoted, and the words "sell or dispose of" occur in section 7 of the same article. In both cases the reference is to bonds under the mortgage. The words "sold or disposed of" in section 2, article 2, are qualified by the words "as in this mortgage provided." The meaning of this qualification is that the sale or disposition of the bonds should be in accordance with the provisions of article 1, sections 2 to 6, inclusive. No other method of selling or disposing of the bonds was contemplated. It would be unnatural to suppose that the parties had in mind in 1899, when the mortgage was executed, that the bonds should, any of them, be "disposed of" by cremation before issuance. The qualifying words in section 2, article 2, in my judgment, show clearly what was meant by the words "sold or disposed of," and the same meaning should be given to them in paragraph VII of the granting clause.

That the foregoing is the proper construction of the words "sold or disposed of" is further shown, and, I think conclusively shown, by the provisions of section 7 of the same article 2 which has been quoted above. There is here a plain covenant by the mortgagor that it will not "sell or dispose" of the bonds except in accordance with the provisions of the mortgage. Such methods are specifically provided by sections 2 to 6, inclusive, of article 1. But cremation, cancellation, destruction is not one of them. Section 7, article 2, contemplates, and all of the methods of disposal of the bonds set out in the mortgage contemplate, a disposal of the bonds for value, not a disposal by destruction. This construction of the words "sold or disposed of" is, I think, in accord with numerous authorities. Phelps v. Harris, 101 U. S. 370, 381, 25 L. Ed. 855; Platt v. Union Pacific R. Co., 99 U. S. 48, 25 L. Ed. 424; Love v. Pamplin (C. C.) 21 F. 755, 760; Gould v. Head (C. C.) 41 F. 240, 245.

If the foregoing construction of the words "sold or disposed of" is correct, then it follows that the destruction of the bonds in accordance with the closure agreement of 1912 was not a "sale or disposal," and the operation of the after-acquired property clause in the mortgage was not terminated by such destruction.

Furthermore, it is serious question whether the destruction of the bonds in accordance with the agreement of 1912 for the purpose of terminating the operation of the after-acquired property clause in the mortgage was not a violation of the right of the bondholders, unless they consented. It is beside the point to say that the cancellation of the unis-

sued bonds inured to the benefit of the outstanding bonds. The question is purely one of construction of the mortgage. The holders of the outstanding bonds had the right to stand upon the covenants of the mortgage. Without their consent, there could be no change in the covenants which related to their security, and especially no change which might prejudice their rights. The stopping of further issuance of bonds under the First and Refunding mortgage could be legally accomplished without the consent of the bondholders, but the termination of the operation of the after-acquired property clause would not necessarily follow from such action. Such a result would follow only if all the bonds authorized under the mortgage were "sold or disposed of" within the meaning of those words as used in the mortgage. It is not contended that the bondholders themselves consented to the agreement of 1912, but it is contended that the trustee was the duly accredited representative of the bondholders, and that the consent of the trustee was sufficient. There is strong authority against such a contention.

The position of a trustee under a railroad mortgage before default is generally regarded as a passive one. If it were to be suggested that one of the duties of a trustee was to actively look after the interests of the bondholders by diligently watching the conduct and operations of the mortgagor, the trustee itself would probably be the first to strenuously object. It would say that the mortgage bestowed upon it no such duties or powers. With equal, if not with greater, force, might it be said that the mortgage bestows no power on the trustee to waive or consent to the destruction of any rights which the bondholders have under the terms of the mortgage. This would appear to be the general rule governing the matter, in the absence of express provisions in the mortgage itself.

It should be here stated that there is no claim made that the trustee in signing the closure agreement of 1912 acted in any way other than in the highest good faith.

I do not find it necessary, however, to pass upon these questions, perhaps doubtful, touching the closure agreement of 1912. There are other considerations which in my judgment are controlling. The present intervening committees representing certain bondholders allege in their pleading that the agreement of 1912 was entered into without the knowledge of the bondholders. I find in the record no sufficient proof of this allegation. Nor do I find any showing as to the time when these bondholders first learned of the agreement, even if they did not know of it at the time. Furthermore, I find no proof whether these bondholders had their holdings in 1912, when it is claimed the rights of bondholders were violated, or acquired them later. Interveners should show their status fully. Further, the closure agreement was made in January, 1912. It was consented to, and executed by, the trustee under the First and Refunding mortgage. It was recorded in the proper recording office in eleven counties in Iowa, sixteen counties in Minnesota, and with the secretary of state in South Dakota. The Refunding and Extension mortgage was also similarly recorded. It contained a covenant (article 3, section 3, subdivision E) which showed clearly that the Minneapolis & St. Louis First and Refunding mortgage was considered closed. Both the 1912 agreement and the Refunding and Extension mortgage were part of a known plan for refinancing the newly enlarged system of the Minneapolis & St. Louis Railroad Company. The plan was carried out. Hundreds of thousands of dollars, proceeds of the new bonds, were spent in making improvements and betterments on those portions of the system which were covered by the First and Refunding mortgage. Thousands of dollars more were spent in continuing payments on equipment trusts on which payments had theretofore been made by the railroad company. No protest, so far as appears from the record, was made by any bondholders under the First and Refunding mortgage. No suggestion was offered that all this expenditure should properly be made by drawing down bonds under that mortgage rather than under the Refunding and Extension mortgage.

Fifteen years after the making of the 1912 agreement, during all of which time the railroad company and the trustee under the Refunding and Extension mortgage were acting in reliance on the validity of the agreement, the present intervening bondholders come into court through their committees, and for the first time voice a protest. They ask that equity be done them by declaring the 1912 agreement invalid as to them; but they fail to recognize equities existing in the holders of bonds under the Refunding and Extension mortgage. It is urged that, even if the bondholders knew of the 1912 agreement, yet that there was no action which they could take to remedy the wrong done to them. Let us see. Their contention is that the cancellation of the unissued bonds pursuant to the 1912 agreement was not a "disposal" of the bonds in accordance with the provisions of the mortgage. If this be true, then there was a breach

of the covenant of the railroad company contained in section 7, article 2, of the mortgage, above quoted. For breach of that covenant, a foreclosure could have been had under sections 4 and 16 of article 3 of the mortgage. If the trustee was disqualified to bring a foreclosure suit, a court of equity would unquestionably have allowed suit to be brought by some party who was qualified. Other available remedies also existed.

My conclusions are that these present intervening bondholders have not shown want of knowledge or notice of the agreement of 1912; that means of knowledge has openly and widely existed since the date of the agreement; that the facts show laches in the assertion of the alleged violated rights; and that, under all the circumstances, the equities in the bondholders of the Refunding and Extension mortgage are superior to the equities sought to be asserted by the present intervening bondholders under the First and Refunding mortgage. The conclusion of the special master that no rights based upon the after-acquired property clause in the Minneapolis & St. Louis First and Refunding mortgage can be asserted at present in behalf of the bondholders under that mortgage, in view of the agreement of 1912, is in my opinion correct and just, and it is approved.

### Iowa Central First and Refunding Mortgage.

The special master has found that this mortgage may be considered as having an after-acquired property clause, but that the operation of the clause was terminated by a closure agreement January 1, 1912; and, in any event, was terminated by the consolidation agreement of 1916.

The granting clause of the mortgage contains the same language as that above quoted, (1) and (2), from the Iowa Central First mortgage. It also contains a similar grant of authority to that contained in the Iowa Central First mortgage to the trustee in case of default to enter upon the railway properties and operate, maintain the same, and make replacements (see excerpt No. 3 from Iowa Central First mortgage). It also contains a provision similar to that contained in Iowa Central First mortgage (see excerpt No. 4) for releasing property, including equipment, from the mortgage, and for the replacement of such property by new property, which should become subject to the lien of the mortgage. It did not contain any express covenant by the railway company for maintenance and replacement of equipment as did the Iowa Central First mortgage.

In view of the similarity of language contained in this mortgage to that contained in Iowa Central First mortgage, I reach the same conclusion, viz. that the mortgage did contain an after-acquired property clause applicable to equipment. The reasons need not be repeated.

The next question is as to the effect of the closure agreement of January 1, 1912, upon the after-acquired property clause. This agreement was executed by the Iowa Central Railway Company, maker of the First and Refunding mortgage; by the Guaranty Trust Company of New York, trustee under the mortgage; by Minneapolis Company No. 4, maker of the Refunding and Extension mortgage; and by the Guaranty Trust Company of New York, trustee under that mortgage. This closure agreement contained a covenant by Minneapolis Company No. 4 that it would pay outstanding bonds under the Iowa Central First and Refunding mortgage, and that it would perform all the covenants of that mortgage which were to be performed by the Iowa Central Company. The closure agreement then provided that the Iowa Central Company and Minneapolis Company No. 4 waived the issue of further bonds under the Iowa Central First and Refunding mortgage, and that the remaining bonds not authenticated and delivered should be canceled. This closure agreement is the same in substance as the closure agreement made on the same day relative to the Minneapolis & St. Louis First and Refunding mortgage.

The Iowa Central First and Refunding mortgage contained, in addition to the clauses already considered, the following:

"The Railway Company will not issue, negotiate, sell or dispose of any bonds hereby secured in any manner other than in accordance with the provisions of this indenture, and the agreements in that behalf herein contained; and in issuing, selling, negotiating, or otherwise disposing of such bonds, from time to time, it will well and truly apply, or cause to be applied, the same or the proceeds thereof to and for purposes herein prescribed, and to and for no other or different purpose."

And the mortgage contained express provisions relative to the issue and appropriation of the bonds.

In view of this state of the record, the same questions arise here that were considered in connection with the closure agreement relative to the Minneapolis & St. Louis First and Refunding mortgage. What was there said need not be repeated.

Facts bearing on the other questions, in-

cluding laches, are substantially the same as the facts bearing on the same questions in connection with the Minneapolis & St. Louis First and Refunding mortgage. I reach the same conclusion here as was reached in respect to that mortgage.

### The Keithsburg Bridge.

■ One other matter should be considered in connection with the Iowa Central First and Refunding mortgage, viz. the Keithsburg bridge property. The question to be determined is whether the Iowa Central First mortgage or the Iowa Central First and Refunding mortgage covers this property with a first lien. The special master found in favor of the First and Refunding mortgage. The facts briefly stated are as follows: The Mercer County Bridge Company was incorporated in 1881 under the laws of the state of Illinois. Either that company or its successor constructed a bridge across the Mississippi river from a point near Keithsburg, Ill., to the township of Elliott, Louisa county, Iowa. On May 13, 1885, the bridge became the property of the Keithsburg Bridge Company of Illinois, and it was finally opened for use about February 23, 1886. On June 1, 1885, the Keithsburg Company executed a mortgage covering the bridge to Central Trust Company of New York to secure bonds amounting to $591,000. July 25, 1901, the Keithsburg Bridge Company conveyed the bridge property, including the franchise to operate the same, to the Iowa Central Railway Company, subject to the mortgage above mentioned. The articles of incorporation of the Iowa Central Railway Company described the various lines of railway that the company was to operate. One of the lines was described as having its terminus on the easterly bank of the Mississippi river at Keithsburg; another of the lines was described as having its terminus on the western bank of the Mississippi river opposite Keithsburg. None of the lines described included a bridge over the Mississippi river at Keithsburg. August 1, 1888, the Iowa Central Railway Company made its First mortgage covering its lines of railway in Illinois and Iowa. The two lines above mentioned were included, and were described in the same fashion as above stated. No reference was made in the mortgage to the Keithsburg bridge, which had not then been acquired. March 1, 1901, effective August 16, 1901, the Iowa Central First and Refunding mortgage was executed. It described the lines of railway of the company which were covered; and stated that they were subject to lien of

the Iowa Central First mortgage. It also described the Keithsburg bridge property as covered, and stated that it was already included in the mortgage above mentioned to the Central Trust Company of New York dated June 1, 1885. This Iowa Central First and Refunding mortgage also covered the franchises acquired by the railway company to operate a bridge. This Iowa Central First and Refunding mortgage in the provision for the issue and appropriation of bonds particularly specified that $591,000 of the bonds should be used to exchange for the bonds of the Keithsburg Bridge Company. This provision was carried out between May 8, 1902, and April 29, 1903. A few years later the old bridge was replaced by a new one, located about 60 feet northerly from the old site. This was opened for use in 1910. About $727,000 was expended by the Iowa Central Company in connection with this new bridge. This amount was reimbursed to it by bonds to the same amount under the First and Refunding mortgage. The new bridge was conveyed by the Iowa Central Railway Company to the trustee under the First and Refunding mortgage on May 28, 1909.

It is contended that the Keithsburg bridge came under the lien of the Iowa Central First mortgage; that the bridge was a necessary link in the line of railway and an accession thereto. Reliance is placed upon the following language contained in the charter of the Iowa Central Railway Company:

"The said railways and franchises having been sold under decrees of foreclosure made by the Circuit Court of the United States for the Southern District of Iowa, Central Division, and the said railway connecting at the boundary line of the State of Illinois with the said Central Iowa Railway (of Illinois) and having been heretofore operated, and being hereafter intended to be operated in connection with and in extension of the said Central Iowa Railway (of Illinois)."

Also upon the following language found in the granting clause of the Iowa Central first mortgage:

"* * * As the said railway is now, or may hereafter be laid out, located, built, constructed, completed and acquired between the respective points aforesaid."

It is doubtful in my mind whether the language last quoted has reference to the line of railway which had its western terminus at the east bank of the Mississippi river, or to the shorter line of railway described immediately preceding the quoted words, and which ended at Monmouth Junction. But, however this may be, it is a significant fact that the clause

above quoted does not contain the word "bridge," and that in the clause next succeeding, which contains the following: "And also all station houses, car houses, grain houses, wood houses, coal houses and other buildings and all water tanks, repair and machine shops, and all fences, trestles, culverts, switches, turnouts, crossings and sidings now appertaining or which may hereafter appertain to the railways above mentioned," the word "bridges" is conspicuously absent.

From all of the foregoing facts and others of relevant character, I have reached the conclusion that the Iowa Central First Mortgage does not contain apt language to cover the Keithsburg bridge, and that it was not the intention of the Iowa Central Railway Company that the bridge should be covered by that mortgage; that the Iowa Central First and Refunding mortgage does contain apt and specific language covering the bridge, and that it was the intention of the Iowa Central Railway Company that the bridge should be covered by that mortgage as a first lien. The holding of the special master was correct.

### The White Bear Branch.

This matter does not present a question of after-acquired property, but the question whether the Northern Pacific Railway Company, which has occupied the property since 1901, has any right, title, or interest therein. The short facts are as follows: The White Bear Branch is a line of railway extending from White Bear, Minn., to a point in East Minneapolis (originally St. Anthony), a distance of about 12 miles. For some years prior to 1881, when Minneapolis Company No. 2 was formed by a merger of Minneapolis Company No. 1 and three other railroad companies, this White Bear Branch was owned by Minneapolis Company No. 1, subject to a mortgage for $280,000 executed by the Minneapolis & Duluth Railroad Company, former owner, but which Minneapolis Company No. 1 had guaranteed. Minneapolis Company No. 2 assumed the debts and liabilities of Minneapolis Company No. 1. Minneapolis Company No. 1 had also included this White Bear Branch in its mortgage known as the Merriam Junction-Albert Lea mortgage dated February 1, 1877. Minneapolis Company No. 3 also included it in its mortgage known as Minneapolis & St. Louis First Consolidated Mortgage dated November 1, 1894; and Minneapolis Company No. 4 also included it in its mortgage known as Minneapolis & St. Louis First and Refunding mortgage dated March 1, 1889. November 29, 1901, Minneapolis Company No. 4

and Northern Pacific Railway Company entered into an agreement which recited the ownership of the White Bear Branch by the Minneapolis Company; and that it was subject to a first mortgage for $280,000 and several subordinate mortgages; and which further recited as follows:

"Whereas, the parties have agreed on a sale of said railroad by the party of the first part to the party of the second part on terms expressed in a conveyance duly executed herewith, and bearing the same date, the main consideration of said deed being the assumption by the grantee of said first mortgage, and it is found impracticable to presently clear the title to said railroad from said subordinate mortgages, and it is desired, so far as possible, to protect the title of the grantee under said deed."

The agreement then provided as follows:

"Therefore, and in consideration of the premises, the parties agree:

"1. The Northern Pacific Company agrees to pay the interest as it falls due upon the said first mortgage bonds, and to pay the principal sum of said bonds (two hundred and eighty thousand dollars) when it matures. When the said bonds are paid they shall be placed in possession of the Northern Pacific Company and held by it for the purpose only of protecting its title as hereinafter provided. They shall not be exchanged for or converted into 'First and Refunding Mortgage' bonds of the Minneapolis & St. Louis Company, under mortgage dated March 1, 1899.

"2. The Northern Pacific Company agrees to keep an accurate account of all expenditures for additions, betterments and improvements upon or to said railway and property, but not including expenses of mere repairs and maintenance.

"3. In case the title of the Northern Pacific Company under said deed shall ever be set aside, invalidated or extinguished by foreclosure or otherwise (except in case of some default of the Northern Pacific Company in the performance of any of the terms or provisions of this agreement on its part to be performed), it shall have a lien on all said railway and property for the principal sum of said first mortgage bonds, plus its expenditures, with six per cent. interest from their several dates, for all additions, betterments and improvements as defined in the last preceding paragraph."

On the same date a deed was made by Minneapolis Company No. 4 conveying the White Bear Branch to Northern Pacific Railway Company. The consideration was named

as $1 and the assumption of the $280,000 mortgage. The deed contained the following:

"To have and to hold to the said grantee, its successors and assigns for'ever.

"The said property is subject to a first mortgage bearing date May 1, 1877, made by the Minneapolis & Duluth Railroad Company to the Fidelity Insurance, Trust and Safe Deposit Company of Philadelphia, Trustee, under which bonds are outstanding in the amount of two hundred and eighty thousand dollars, maturing May 1, 1907, and bearing seven per cent. interest.

"This deed is made subj'ect to said mortgage and said bonds which the grantee assumes and covenants to pay, together with the interest thereon from July 1, 1901.

"Except as against said mortgag'e and bonds the grantor covenants to forever warrant and defend the title hereby conveyed against the lawful demands and claims of all persons whomsoever."

These instruments were both duly recorded.

The Northern Pacific Railway Company entered into possession under the agreement and deed. It paid the interest on the mortgage as it fell due and also the principal when it fell due May 1, 1907. It continued to hold, and still holds, the coupons and bonds uncanceled, pursuant to the terms of the agreement. The mortgage has never been satisfied of record.

It is the contention of the trustees under the Minneapolis & St. Louis First Consolidated mortgage and the First and Refunding mortgage that, by the payment of the $280,-000 mortgage by the Northern Pacific Railway Company the mortgage became merged in the title; and that the White Bear Branch is subject to foreclosure sale under' the First Consolidated and First and Refunding mortgages, subject, of course, to the Merriam Junction-Albert Lea mortgage, but free and clear of any lien or claim on the part of the Northern Pacific Railway Company arising out of the $280,000 mortgage.

On the other hand, it is the contention of the Northern Pacific Railway Company that it became a mortgagee in possession; that the right to foreclose the $280,000 mortgage arose in 1907 at the maturity of the mortgage; that the right to redeem arose at the same time; that the junior mortgagees are now barred by the statute of limitations (15 years) from making redemption or interfering with the possession of the Northern Pacific Railway Company.

The special master found in favor of the trustee under the First Consolidated and First and Refunding mortgages. I am unable to agree, either with this conclusion or with the contention of counsel for the Northern Pacific Railway Company to the full extent. The agreement of 1901 was made in good faith, and was not wholly invalid. It should be the aim of a court of equity to assist in carrying out the agreement if this can be done without prejudicing the rights of any of the parties interested. The agreement expressly provided that the bonds when paid should be held by the Northern Pacific Railway Company to protect its title. The time has come when its title needs protection. There existed no legal obstacle to an assignment of the mortgage to the Northern Pacific Railway Company when it should fall due, and to an extension thereof until the maturity or foreclosure of the subordinate mortgages. This, in substance, is what has been done pursuant to the agr'ement between Minneapolis Company No. 4 and the Northern Pacific Railway Company.

The general rule that the grantee of a mortgagor, who assumes a mortgage upon property conveyed to him by the mortgagor, extinguishes not only the debt but also the mortgage when he pays the debt, is not applicable to the facts in this matter. In the first place, this property was not conveyed to the Northern Pacific Railway Company by a mortgagor. Minneapolis Company No. 4 was the grantor in the deed; but it was not the maker of the mortgage which was assumed by the Northern Pacific Railway Company; nor, so far as the record shows, had Minneapolis Company No. 4 or its predecessor, Minneapolis Company No. 3, ever assumed that mortgage. In the second place, the rule above stated is by no means universal. The merger of the legal estate with a mortgage acquired by the owner of the legal estate depends upon the intent of the parties. Wilcox and Barber v. Davis, 4 Minn. 197 (Gil. 139); Horton v. Maffitt, 14 Minn. 289 (Gil. 216), 100 Am. Dec. 222; Hall v. Southwick, 27 Minn. 234, 6 N. W. 799.

An intent that there should not be a merger may be presumed, if it is for the interest of the party in whom the two estates meet. Davis v. Pierce, 10 Minn. 376 (Gil. 302); Flanigan v. Sable, 44 Minn. 417, 46 N. W. 854.

Even the assumption of the mortgage debt by the grantee does not prevent the operation of the rule of intent. Kellogg v. Ames, 41 N. Y. 259; Coles v. Appleby, 87 N. Y. 114.

The doctrine of conventional subrogation is also, I think, applicable here. Let us as-

sume that, instead of the agreement and deed which were made in 1901, there had been a contract of purchase made by the Northern Pacific Railway Company; that, under the terms of such contract, the Northern Pacific Railway Company entered into possession and agreed to pay as rent the amount of the interest on the $280,000 mortgage, and that Minneapolis Company No. 4 agreed to keep up the payments of interest; that the contract further provided that, when the mortgage fell due, the Northern Pacific Railway Company would advance the money to pay the mortgage; that Minneapolis Company No. 4 should thereupon pay it, and·then deed the property to the Northern Pacific Railway Company for $1; that the mortgage so paid should not be satisfied, but should be kept alive to protect the Northern Pacific Railway Company against the subordinate mortgages. Can it be doubted that under such circumstances the lien of the mortgage would have been kept alive, though the legal title came into the Northern Pacific Railway Company? The case of Platte Valley Cattle Co. v. Bosserman-Gates Live Stock & Loan Co. (C. C. A.) 202 F. 692, 45 L. R. A. (N. S.) 1137, seems to be conclusive on this question. In the opinion written by the late Circuit Judge Walter H. Sanborn is found the following language:

"But a third person, not a volunteer, who pays and procures a release of a first lien upon property under an agreement with the owner that as purchaser, or first lienor, he shall have the pecuniary benefit of such payment, becomes subrogated in equity, as against an inferior lienor whose burden is not increased by such subrogation, to the rights held by the first lienor before the payment was made. * * * This is a just and reasonable rule. It effects the intention of the parties, preserves to the payor the benefit of his payment, leaves the inferior lienor in his former position, inflicts no injury upon him, prevents injury to the payor through mistake or ignorance of the inferior lien, and works exact justice to all. The facts tendered in the offer bring the case at bar clearly within this rule. The defendant was not a volunteer. It was a purchaser. It paid the first lien to obtain the pecuniary benefit of its payment as vendee in accordance with the terms of its contract of purchase with the owner. Its subrogation to the rights of the first mortgagee imposes no additional burden upon the second mortgagee, but leaves it in its former position. And the undoubted effect of the transaction was that, while between the first mortgagee and the debtor

Brown the defendant's payment and the first mortgagee's release of its mortgage estopped the latter from thereafter enforcing its claim against Brown, it subrogated the defendant in equity as against the second mortgagee to all rights held by the first mortgagee before the sale."

The facts in the case at bar, while somewhat different from those assumed above, are not substantially so when carefully analyzed. In my judgment, the case last cited is controlling here.

It is not necessary to decide whether the Northern Pacific Railway Company was a mortgagee in possession, or the legal owner with the right to keep intact and unmerged the lien of the mortgage. In either event, its equities were superior to those of the later mortgagees.

It remains necessary to fix the amount of the equitable lien of the Northern Pacific Railway Company. The agreement of 1901 contemplates a lien in an amount equal to the principal amount of the bonds with interest from November 29, 1901, to May 1, 1907, the date of maturity of the bonds, plus the amount paid out for betterments and improvements with interest also on the latter sum. In my opinion, the amount should be limited to the amount of the bonds and interest to date of maturity. To allow the amount paid out for betterments and improvements would be to allow an increase in the amount of the lien as it originally existed, without the consent of the underlying mortgagees and to their prejudice. It would be a displacement pro tanto of their mortgage liens. This would be inequitable, and, accordingly, is not allowed.

It may not be feasible to make final disposition of this lien of the Northern Pacific Railway Company at this time, since the Merriam Junction-Albert Lea mortgage, which constitutes the next subordinate lien, is not in foreclosure. The decree, however, should provide that the Northern Pacific Railway Company has a lien on the property in the amount above named, and that it is superior to the liens under the Merriam Junction-Albert Lea, First Consolidated, and First and Refunding mortgages of the Minneapolis & St. Louis Railroad Company. Sales under the last two named mortgages or either thereof should be made expressly subject to such prior lien, which by the decree should be continued in existence. The successful bidder at the sale shall be entitled to an assignment from the Northern Pacific Railway Company of its said lien upon payment to that company of the amount of the lien as

above fixed, unless the Northern Pacific Railway Company should elect to pay to said bidder the amount of the bid and receive an assignment of the rights of said bidder. The Northern Pacific Railway Company may itself be a bidder at the sale. If it is the successful bidder, it shall pay its bid in cash and receive a conveyance of all rights in the property of the trustee of the mortgage under which the sale is made. The decree should further provide that the Northern Pacific Railway Company may remain in possession until all three of the subordinate mortgages are paid or otherwise satisfied, at which time its title and its lien shall merge, unless prior thereto it voluntarily parts with its said lien, in which case its right of possession shall cease, and it shall convey to the owner of said lien the legal title.

If any better way of providing for this lien than the one suggested is found before the settlement of the decree, it may be considered at that time.

### In Conclusion.

Some of the findings of the special master which were the subject of exceptions by one or more of the parties interested have been modified by mutual consent. If in the foregoing discussion I have inadvertently omitted to dispose of exceptions which are deemed vital by the parties making them, attention may be called to such omissions at the time of settling the decree.

Except as indicated in the foregoing opinion or in the last-mentioned provision, the exceptions by the several parties interested to the findings and conclusions of the special master are each and all overruled; and, except as modified, the findings, conclusions, and report of the special master are hereby approved and confirmed.

A decree may be prepared accordingly by counsel for the Guaranty Trust Company and filed within 30 days after the date of this order. The date for settlement of the decree is hereby fixed as January 5, 1929.

### Supplemental Order.

The above-entitled causes came regularly on for hearing on January 5, 1929, upon the matter of the settlement of a final decree. Application was made by the Northern Pacific Railway Company for leave to introduce further evidence relative to the amount of the lien theretofore found by the court to exist in its favor on the so-called White Bear Line. The application was granted, and the matter was referred to Howard S. Abbott as special master to hear "the evidence of the parties

and to determine the reasonable value of the necessary additions and betterments made on that line since taken over by the Northern Pacific Railway Company, which amount when so found, to be included in the amount of said alleged lien of said Railway Company." At the hearing before the special master the Central Union Trust Company, trustee, the New York Trust Company, trustee, and the Bennett committee appeared by their respective counsel, and filed with the special master written objections to the order of reference; and further objected to the taking of any evidence pursuant to said order. The special master, being of the opinion that he had no authority to pass upon said written objections, received the same, took the evidence offered by the respective parties, and made his report to the court, attaching thereto said written objections.

The hearing on said report of the special master having come on before the court on the 8th of January, 1929, the several parties in interest appeared by their respective counsel. Exceptions to said report of the special master were filed by the Northern Pacific Railway Company, the Central Union Trust Company, trustee, the New York Trust Company, trustee, and the Bennett committee. And the court, being duly advised in the premises, hereby orders:

(1) That the written objections, heretofore mentioned, filed with the special master, are each and all hereby overruled. Exceptions are allowed to each of the several objectors.

(2) That the exceptions to the report of the special master, filed by the several parties as heretofore stated, are each and all hereby overruled. Exceptions are allowed to each of the exceptors as to each of their respective exceptions overruled.

(3) That the report of the special master is in all things approved and confirmed. Exceptions are allowed to each of the parties filing exceptions to said report.

### Memorandum.

In the order of November 10, 1928, modifying and approving the report of the special master in the six mortgage foreclosure cases, I found a lien in favor of the Northern Pacific Railway Company on the White Bear Line, prior and superior to the mortgage liens which existed on the same line. I expressed the opinion that the amount of the lien of the Northern Pacific Railway Company should be the principal amount of the mortgage ($280,000), which the Northern Pacific Railway Company had assumed in 1901, and

interest thereon to the date of the maturity of that mortgage in 1907.

On the hearing for the settlement of the final decree in the six mortgage foreclosure cases on January 5, 1929, the matter of the lien of the Northern Pacific Railway Company on the White Bear Line again came up for consideration. From the discussion of counsel, I became convinced that the interest which had been allowed in the order of November 10, 1928, as part of the lien ought not to be included. I was further persuaded that there might be certain improvements and betterments which had been made by the Northern Pacific Railway Company on the White Bear Line, the amount of which ought to be included in the amount of the lien of the Northern Pacific Railway Company; and this, too, whether such lien was considered as an equitable lien arising out of the contract of November 29, 1901, or as a lien accruing to the Northern Pacific Railway Company as a mortgagee in possession. Having reached this conclusion, the matter was referred, on application of the Northern Pacific Railway Company, to the special master to determine the reasonable amount of such necessary improvements and betterments made by the Northern Pacific Company.

The amount found by the special master and approved by the court has been added to the $280,000, and the total makes up the amount of the lien of the Northern Pacific Railway Company, as set out in the final decree in the six mortgage foreclosure cases.